## OLIVER VS. THE STATE.

1. NEW TRIAL: *When circuit court should grant.*

The circuit judge has the discretion to grant new trials in all cases, where he is satisfied that the ends of justice will be best subserved thereby; and should not hesitate to exercise it where he is dissatisfied with a verdict, as being the result of excitement, passion or prejudice, or any other influence save a calm consideration of the facts in evidence.

2. SAME: *For want of evidence to support verdict.*

The following rules seem to result from all the previous decisions of this court in relation to setting aside verdicts for insufficiency of evidence:

1. Where there has been a conflict of evidence, a new trial will not be granted by the supreme court, merely because the preponderance of evidence in the mind of the court, may seem to be against the verdict.

2. But in all cases, even in those of conflict, the supreme court will direct a new trial, when, upon inspection of the evidence, the verdict is so clearly and palpably against the weight of it as to shock a sense of justice.

3. A new trial will be granted where there is no evidence at all to support the verdict, or where it fails in some material link. The jury will not be allowed to supply the missing link by inferences and presumptions from other facts, unless they be legitimate and fair presumptions, such as naturally follow.

APPEAL from *Phillips* Circuit Court.

Hon. J. N. CYPERT, Circuit Judge.

*Tappan & Horner, Rose,* for appellant.

*Henderson, Attorney General, contra.*

EAKIN, J. The appellant was charged with the murder of Robert N. Yerby, convicted of manslaughter, and sentenced to five years' imprisonment in the penitentiary.

There is no complaint of any error in the admission or rejection of testimony. Up to the rendition of the verdict the trial is conceded to have been fair. The instructions

were all that the appellant asked, and as favorable as he could have desired. A new trial was asked, simply on the ground that the verdict was contrary to the law and the evidence. The court refused, and the propriety of this refusal is all that we have to determine. The evidence presents, substantially, the following history:'

Upon the fourth of July, 1875, a bitter quarrel occurred between the deceased and his friends on one side, and the appellant on the other. Very insulting language had been used on both sides; the deceased having, first, accused the father of appellant, to his son, of having broken open a letter improperly. In the course of the quarrel, the deceased had been taunted with his improper relations with a negro woman, and had responded by saying she was as good as any white woman in the "diggins," and explained that he meant it for Oliver's wife. The result of the quarrel on the fourth was that Oliver fled from the crowd, which was composed mostly, if not wholly, of Yerby's friends, and was pursued by some of them a short distance, but reached his home in safety. The proof shows generally that there was bitter feeling between Yerby on one side, and the Olivers on the other, and passionate threats had been made by both Yerby and R. H. Oliver.

The parties, it seems, lived on the same side of the Mississippi river, at no great distance from each other, but using different landings. Yerby lived at the landing below, and the elder Oliver, the father, at the upper landing, *and above,* the distance around by the river being eight or ten miles, the distance across being short, and all below Helena. The appellant lived in the bend, but used the upper landing.

Upon the evening of the quarrel, Yerby returned home much excited and stung by the taunt regarding the negro

woman.   He wrote, and sent by a friend, to R. H. Oliver a note, denouncing him as "a scoundrel and a damned puppy," offering to give him satisfaction, and referring to the bearer of the note as his friend.   It was evidently intended as a challenge.   Oliver replied, verbally, to the bearer, that he would not fight Yerby in a duel ; but that *he* was going up to Helena next day to institute proceedings at law against Yerby.

That night Yerby got upon the steamer A. J. White, passing up.   He was much excited, drinking and crying; spoke of his quarrel with the Olivers, and declared that it would have to be settled that night.   It is in proof that although quiet when sober, he had the reputation of being a desperate and dangerous man when drinking; and that he was more often drinking than cool and sober.

On approaching the landing of the·Olivers, the boat was hailed by R. H. Oliver discharging a gun for the purpose. The boat neared the landing, when Yerby discovered the Olivers, father and son, coming aboard.   He exclaimed : "Here they come, now !" ran down the steps from the boiler-deck. and took a position behind a stancheon at the foot of the first flight of steps, with a pistol in his hand. When the Olivers came aboard, the torch-light was extinguished, which had been held out on the land side, and the Olivers started up the steps.   The father, being before, passed Yerby without seeing him.   The·son came after, with the empty gun in his hands.   The lock of one barrel was out of order, and the other barrel had been discharged to hail the boat.   Yerby seized hold of the gun with his left hand, held the pistol in a threatening attitude with his right, and accusing Oliver of having brought the gun aboard for him.   R. H. Oliver explained that the gun was not loaded, and Yerby said it was a damned lie.   The father,

hearing the noise, turned, and some quick words passed between him and Yerby. There is some proof that Yerby turned the pistol on the father; others say he had it by his side, but still holding the gun with his other hand, when R. H. Oliver drew a pistol from his pocket with his left hand, shot Yerby, and killed him. The father shot about the same time, but the shot did not take effect.

After the death of Yerby, the Olivers had the boat stopped and were put ashore. They explained it by showing they had no loaded arms, and feared they might be injured by Yerby's friends. The gun-barrel was empty, and the pistol of the father had only one chamber loaded, which had been discharged in the fracas.

This is all the material evidence. The verdict, being for manslaughter, is an acquittal of murder, and positive against malice. This excludes from consideration all that happened on the fourth of July, except so far as it may have contributed to make the impression on R. H. Oliver, at the time of the contest, that his or his father's life was endangered by Yerby's assault. This excludes also from consideration all the threats made by Oliver, as the killing could not have been in pursuance of the threats without murder. It also excludes any supposition that the Olivers went aboard the boat with intent to attack Yerby. Indeed the proof is positive that they went aboard for peaceful and proper purposes, and that their arms were not prepared for a fight, in any suitable manner. There is no proof that either of them knew that Yerby was on board the boat.

The only question left for the jury to determine was this: Did Oliver kill Yerby under a reasonable apprehension that if he did not, Yerby would either kill him or his father, or inflict upon one or the other of them great

bodily harm, and were the circumstances such that he could not safely withdraw from the contest? If he had such reasonable apprehension, and could not safely withdraw by the exercise of ordinary prudence and presence of mind, he was justified in killing.

This was a question for the jury in the first place, and they found, in effect, that Oliver did not kill Yerby in malice, but under circumstances which did not justify the act in self-defense. In other words, to sustain the verdict, they must have found either that Oliver had no reasonable ground to apprehend the death or bodily harm of himself or his father, or that he might by ordinary prudence have avoided it without the necessity of killing Yerby.

The attack of Yerby upon appellant was sudden, unexpected and menacing. He seized Oliver's gun with one hand, using violent and angry language; and when Oliver explained to him that it was not loaded, he answered that it was " a damned lie." He had a pistol in his right hand, which in a second could be pointed and fired in any direction. The struggle for the gun continued on the narrow steps of a steamboat staircase, boarded up on each side, leaving no reasonable chance to escape with safety. Yerby was known to be a deadly enemy, a man much exasperated, desperate and dangerous when drinking, and likely to cut and shoot. He had been drinking then. There can be little doubt that he meant it should result fatally to himself or one of the Olivers. It is most probable that, if Yerby had not been killed, he would in his excited condition have discharged his pistol at appellant or his father before the contest was over.

It devolved, in the first instance, upon the honorable circuit judge to determine, upon the motion for a new trial, whether or not the verdict was contrary to the law

Oliver vs. The State.

and the evidence. This is a duty of great delicacy, but imperatively required, especially in criminal cases where the law itself compels the jurors to give to the prisoner the benefit of all reasonable doubts. The jurors are, nevertheless, the judges of the facts, and of the law in its application to them. It is the duty of the circuit judge so far to respect their province as not to interfere with their verdicts rendered without misconduct upon proper instructions; and weighing the evidence. At the same time, the strict rules established here for the regulation of this court do not apply to the circuit judges. They preside in the courts and take personal cognizance of all that occurs in the progress of causes. It is their duty to see that juries do not transcend the proper limits of their authority, and that all trials are fair and in accordance with law. The circuit judge has the discretion to grant new trials in all cases where he is satisfied that the ends of justice will be best subserved thereby, and should not hesitate to exercise it where he is dissatisfied with a verdict, as having reason to believe it the result of excitement, passion, prejudice, or any other influence save a calm consideration of the facts in evidence.

Upon the refusal of the circuit judge to grant a new trial, a stricter rule has been applied here, which must govern our action in the case in judgment. This rule, as originally laid down in the case of *Howell v. Webb, 2 Ark., 360,* was that "to authorize a new trial, the verdict must have been against the weight of evidence—so much so that on the first blush of it, it would shock our sense of right and justice." This principle has been recognized and the language repeated in many subsequent cases. [See *Vandever v. Wilson, 5 Ark., 407; Hazen v. Henry, 6 Ark., 89; Lewis v. Read, 6 Ark., 428; State Bank v. Woody*

*et al., 10 Ark., 638; Calvert v. Stone 10 Ark., 492;* and many subsequent cases]. In the case of *Drumer v. Brown, 10 Ark., 140,* Justice Walker referred with approbation to *Howell v. Webb (supra),* but announced the doctrine in another form, to-wit: That a new trial would never be granted here on the *mere weight* of evidence, unless it were *clearly insufficient.* It is obvious that the effect of the declarations is, in each case the same. In the case of *Hubbard v. State, 10 Ark., 378,* it was not essential that the evidence should show guilt beyond question, but only necessary that it should not appear *actually insufficient.* So in the case of *Mayers v. State, 7 Ark., 174,* it had been held that a new trial could not be granted here on the *merc weight* of evidence; and in *Robinson v. State,* a new trial was refused because there was no "palpable injustice" in the verdict—*7 Ark., 122.* So also, in *Spratt et al. v. Vaughn, 10 Ark., 474,* this court refused a new trial where the verdict turned on the *weight of conflicting* evidence; and in *Bivens v. State,* it was held that a *slight dissatisfaction* with the verdict was not sufficient for reversal. [See *11 Ark., 455*]. In *Sparks v. Beavers, 11 Ark., 630,* Mr. Justice Walker, delivering the opinion of the court said: "This court has repeatedly decided that it will not reverse the decision of the circuit court for refusing a new trial when the only ground presented was the mere weight of evidence, unless there is a *total lack* of evidence upon some point indispensably necessary to a recovery, *or* unless the verdict is *clearly and palpably contrary to the weight of evidence.*"

There is another class of cases, in which there has been evidence of some facts, from which the jury has inferred other facts necessary to sustain the verdict, in which this court has granted a new trial on the grounds that the

facts shown did not warrant the inference, and that therefore the evidence was insufficient. Of this nature are the cases of *Wait v. White, 5 Ark , 640;* and especially *Pogue, use of Calvert, v. Joyner, 7 Ark., 462.* These are not cases of *conflict,* but want of evidence. I have cited only the earlier cases, because in these the principles governing this court in such cases, have been announced, and an effort has been made to formulate them into rules. The cases have been followed in the subsequent decisions, to be found in almost every volume of the reports. Of course, no positive rules can be announced of strict and unvarying application, but the general policy of the court may be fairly understood from what has been said.

It will be seen, and in view of a very common misapprehension it is worth noting, that this court has never adopted the rule of refusing a new trial in all or any cases, where there has been *any evidence whatever,* however weak, to support the verdict—what is called a *scintilla* of evidence. The following more rational rules seem to result from all the decisions:

1. Where there has been a *conflict* of evidence a new trial will not be granted here, merely because the preponderance of evidence, in the mind of the court, may seem to be against the verdict. That deference will be accorded to the jury whose peculiar province it is to compare, sift, and weigh the evidence; and to the circuit judge, whose duty it is to supervise the trial, and grant a new one, if, in his opinion, the verdict has resulted from improper influence misconduct of jurors, excitement, prejudice, hasty judgment, misapprehension of the law, or any other of the recognized causes for a new trial.

2. But in all cases, even those of conflict, this court will direct a new trial, when, upon inspection of the evidence,

the verdict is so clearly and palpably against the weight of it as to shock a sense of justice. The line lies between a mere preponderance within the bounds of a fair difference of opinion, and that gross preponderance which indicates an unreasoning passion or prejudice on the part of the jury, or misapprehension of the law, or disregard of the legitimate sphere of their action.

3. A new trial will be granted when there is no evidence at all to support the verdict, or where it fails in some material link. The jury will not be allowed to supply the missing link by inferences and presumptions from other facts—unless they be legitimate and fair presumptions, such as naturally follow.

We come now to the delicate and responsible duty of applying these rules to the case before us. There is little conflict of evidence concerning the occurrences at the time of the killing, and nothing to affect materially the credit of any witness. Indeed they agree in an exceptional manner.

The indictment was for murder, and the burden was on the state to prove the killing. This she did, and in so doing showed, substantially, the circumstances relied upon for justification. Her proof was supplemented on this point by witnesses for defendant, so that the jury had all the facts before them, without any room for presumptions. They were properly instructed, and declared, upon those facts, that the act was *not* one of necessary self-defense. The verdict upon the matter they had to consider, after the killing was divested of malice, amounted simply to a negation. They did *not* consider that Oliver killed Yerby under a reasonable apprehension of death, or great bodily harm to himself or his father, unless he did so.

We, as jurors do, must judge of men and their actions from our knowledge of human passions, human motives,

Oliver vs. The State.

and the ordinary conduct of men in given positions. We have to judge of those of a man who had unfortunately put himself out of the pale of society by subjecting himself to the general opinion, in the neighborhood, of living in adultery with a colored woman; one who had abandoned himself to drinking; a man, plainly of violent resentments and reckless of consequences—a baffled duelist, chafing under Oliver's refusal to give him a meeting, and also under Oliver's allusion to his woman. He is known to be bitterly hostile to the Olivers and attacks them in the manner described. Almost any man would have apprehended death to himself under such circumstances, and would have little hope of finally withdrawing from the conflict unharmed. Considering the character and motives of Yerby, it is so plain to us that the Olivers were in danger, and so probable that death would have resulted to one of them had Yerby not been killed, that it shocks our sense of justice, under the evidence presented, to deny him the benefit of self-defense. We think the verdict plainly and palpably contrary to the weight of evidence, and that this case falls legitimately within the exception to the rule against disturbing verdicts.

We have intentionally refrained from any more comment on the evidence than this opinion required. It must come again before another jury, to be all considered *de novo*, with such other evidence as may be adduced.

Reverse and remand, with directions to grant a new trial, on the charge of manslaughter alone.