### TELANDER *v.* SUNLIN *et al.*

*(Circuit Court, D. Minnesota, Fourth Division. January 13, 1891.)*

1. MASTER AND SERVANT—NEGLIGENCE—FOREMAN'S AUTHORITY.
   Where an employer places an employe as foreman in charge of a piece of work requiring several days' labor, away from his own factory, and of such a nature as may reasonably be supposed to require the use of appliances for raising and lowering a heavy piece of iron, but does not furnish such appliances, the foreman has implied authority to provide blocks and tackle by borrowing or otherwise, and if he obtains and uses insufficient ones, whereby a workman under his control, without fault on his own part, is injured, the employer is liable.

2. SAME.
   The fact that at the commencement of the work sufficient blocks and tackle were in the required position, and were used by the foreman in doing part of the work, does not rebut the presumption of authority to procure what was needed, when such blocks and tackle were placed there by a third person, who had borrowed them for his own use in doing a different part of the work, and who afterwards removed them.

3. SAME—CONTRIBUTORY NEGLIGENCE.
   Plaintiff was working in a dark place, on the interior of a large iron hoop, when the latter was raised and held suspended by rope and tackle, and he was directed to remove some dirt and stones from underneath it. While doing so the rope broke, and his hand was injured. He testified that he had a monkey-wrench in his hand, but it was crooked, and he could not use it, and that he was removing a stone weighing four or five pounds with his hands when the injury occurred. *Held* no sufficient proof of contributory negligence to warrant the court in directing a verdict.

At Law. On motion for a new trial.

This action is brought to recover damages for personal injuries. It was tried before a court and jury at the September term of the court, at Minneapolis, for 1890. The plaintiff had a verdict for $1,000, and a motion for a new trial was made by the defendants in due time, and heard before Judge NELSON and myself on the 10th day of November, 1890.

The leading facts developed at the trial are as follows: The defendants are boiler-makers, doing business in Minneapolis, and were at the time of the injury engaged in putting an intake pipe in position over a turbine wheel case for the Humbolt mill at Minneapolis. The intake pipe is a cylinder of boiler iron, weighing about 3,500 pounds, and large enough to permit four or five men to work inside of it. When in position it rests on and is riveted to the wheel case, which is outside, and surrounds, the turbine wheel. The intake serves as a conduit for the water passing in and over the wheel. There is an iron shaft from the center of the turbine wheel, extending up to the top of the platform in the wheel-house. The defendants had the contract of putting in this intake and riveting it to the wheel case. One Peterson was a boiler-maker in the employ of the defendants, and was placed by the defendants in charge of that work. The plaintiff was also in the employ of the defendants, and was furnished by them as one of the helpers to Peterson, and assisted him. He, (the plaintiff,) and the others with him, were under the control of Peterson, and were subject to his orders. The intake pipe was resting on uprights, five or six feet above the wheel case, and it was necessary to put an iron ring on and around it at the lower end. Through this ring the bolts are placed by which the intake is riveted to the wheel case when in position. The defendants instructed Peterson, a boiler-maker, to go down and put the ring onto the intake, and put the bolts in, and let the intake down and rivet it to the wheel case. Plaintiff and one or two others were sent to assist him as helpers. Pursuant to instructions, Peterson put the ring on the intake, and let the intake down onto the wheel case, and, after putting the bolts in and moving the intake around so as to bring the holes of the intake and the wheel case in corresponding position, found it necessary to raise the intake for the purpose of removing dirt and stones which had fallen in between the intake and the wheel case, thereby preventing the smooth surfaces from coming together. Plaintiff and others assisted in doing this work, as helpers, and worked under Peterson's orders, and subject to his control. When Peterson was ready to raise the intake, for the purpose of cleaning out the stone and dirt, he found that there was no rope and tackle, or other appliance, for doing the work. The one that had been used by him in letting down the intake had been taken away. Peterson looked around and found a rope and tackle lying down in the tail-race on the platform belonging to the defendants, but, as he says, it was too short and too small; therefore he did not use it. Defendants had no other, and owned no other, rope and tackle, except this one that was lying in the tail-race at the time. Peterson, after looking about, found a rope and tackle in the wheel-house of the Humbolt mill, and borrowed it of one Spillman, who was in charge of the mill, and, by using a chain in connection with

it that belonged to the defendants, he rigged up an apparatus by which an attempt was made to raise and hold suspended the intake while the dirt and stones were being cleaned out. The plaintiff, during this time, was down in the wheel case, where it was dark, and did not assist in putting up the apparatus, and did not see it, and could not from where he was at work. After getting the apparatus for raising the intake ready, Peterson placed some parties at the windlass to raise the intake, and gave orders to plaintiff and one Goula, who was in the wheel case with plaintiff, to clean out the stones when the intake should be raised. Peterson then ordered the intake to be raised, and as soon as it was lifted four or five inches plaintiff commenced to clean out the stones and dirt with his hands. The rope broke almost immediately after the intake was raised five or six inches, and the intake came down on plaintiff's hands while he was in the act of removing stones, and he sustained a permanent injury. Plaintiff says he had in his hand a monkey-wrench, but could not use it, as it was crooked, and he could not pick the stones out with it, and that he attempted to take them out with his hands, and he had his hand on a stone weighing four or five pounds that was between the surfaces when the intake fell. The other helper, Goula, used a stick, but plaintiff says that he did not see him, and that he received no instructions as to the means to be used. There was evidence tending to show that the rope was old and defective, and not of sufficient strength for the purpose, and that its defective character could be easily detected on inspection. There was also evidence tending to show that the iron shaft extending from the turbine wheel up through the intake to the wheel-house had a joint, or what is termed in the evidence a "nigger-head," on it, about three feet above the intake, and that the nigger-head rested on the plate that projected horizontally from the shaft about seven inches. Also evidence was given tending to show that the accident would not have happened if the chain by which the intake pipe was attached to the rope block had been so fastened as to come up over this obstruction on the shaft. Peterson made the attachment or hitch by doubling the chain. This had the effect of making an extra strain upon the rope by reason of the projection upon which the nigger-head rested. Peterson doubled the chain in making the attachment, instead of using it single, because, as he says, he thought that the chain was not strong enough unless it was doubled. Evidence was given to show that the chain, if it had been used single, would have come above the nigger-head, and thereby the extra strain would have been prevented, and that the chain was of sufficient strength to have been used single. When Peterson let the intake down at the time he removed the bolts, he used the rope and tackle that was then in position above the intake. This rope and tackle had been placed there by one Spillman, who was there in charge of the Humbolt mill, for the use of the mill. It belonged to the Twin City Iron-Works, and was borrowed by Spillman. It was placed in position by Spillman, and used by him in connection with another rope and tackle in letting the wheel down some two or three days before the accident. Defendants had nothing to do with letting this

wheel down, and it was no part of their work. It was work that be-longed to the Humbolt mill alone. After the wheel was let down by Spillman, he left the rope and tackle in position, where he used it for a short time, and while it was there Peterson made use of it to let the intake down at the time he took the uprights out, and the defendants used it once to raise and lower the wheel case. Spillman, having no further use for this rope and tackle, returned it to the Twin City Iron-Works from where he borrowed it. It does not distinctly appear how long the rope and tackle was in position above the intake, but it does appear that the wheel was let down about two days before the accident; that this rope and tackle was obtained and placed in position for that purpose; and Spillman testifies that he took it home about two days before the accident. It could have been in position but a short while.

Spillman, a witness produced on the part of the plaintiff, testified in relation to the borrowing of this rope and tackle, as follows. Speaking of the Twin City Iron-Works tackle he says:

"*Answer.* It belonged to the Twin City Iron-Works. *Question.* You had sent it back? *A.* We had borrowed it for our own use, and when we got through with it I sent it back. *Q.* Borrowed it for your own use? *A.* Borrowed it for our own use. *Q.* It was not defendants that had it, then? *A.* No, sir. It was not the defendants. We had it. *Q.* Do you know whether Mr. Cour or Mr. Sunlin obtained permission to use the Twin City tackle? *A.* No, sir. I don't know anything about that. When I borrowed the Twin City tackle— That man there, Cour's partner, is the man I got it from; that is, he went and dug them up for me in the Twin City Iron-Works. *Q.* Mr. Sunlin got it for you? *A.* Yes. I borrowed it from him; that is, he got it for me. I borrowed it from him before, and I went down there to borrow them, and he is the man that helped me dig them up and find them. *Q.* Mr. Sunlin went down with you to get them? *A.* That is, I went into the boiler-works, and was looking around. I was a stranger, and went in and happened to find him, and I asked him where the rope block was, and he helped me find it. *Q.* You had permission before that to go and get it? *A.* Permission from somebody. I don't know. Scott got permission. *Q.* Did you prohibit the defendants from using that tackle for their work? *A.* No, sir. *Q.* Was this the first morning that Peterson was there at work? *A.* No, sir. He had been there before. Peterson had been there trying to put on the rim for three or four days, I guess."

Sunlin, one of the defendants, testified to the borrowing of this tackle, as follows:

"*Q.* Do you remember going with Spillman for the purpose of getting the Twin City tackle? *A.* Yes, sir. He came down to the shop— First I seen the man that I was figuring with on the work, and he says, 'Can I get the rope?' And I says, 'Yes.' And he says, 'I will send the men down.' And this man that was up here gave his name as Spillman. He came with another man, and he came to me and says, 'I want to get that rope.' I says, 'All right. I will get it for you.' And I took him into the machine-shop. *Q.* What machine-shop? *A.* In the Twin City Iron-Works machine-shop. First I went to the president, and the man that acts as superintendent, and asked him if I could get the rope and tackle, and he says, 'Yes.' And I says, 'I want to show this man where the rope was.' And I says, 'You can take it, because I will want this rope myself down there on this work.' *Q.* How long before the accident? Do you know? *A.* That must have been some—we

had four weeks to complete the job—it must have been some three weeks,—three or four weeks. *Q.* Did you have charge of this job yourself? *A.* No, sir. I just took and gave the man the price of the job, and he says the job was accepted, and that my price was accepted. *Q.* So Mr. Cour had charge of it, did he? *A.* Yes. Mr. Cour has charge of all the work. I did the figuring and took the contracts, and he attends to the work."

Defendants, or one of them, were at the place of work almost daily.

*Arctander & Arctander,* for plaintiff.

*Ketchell, Cohen & Shaw,* for defendants.

THOMAS, J., *(after stating the facts as above.)* At the close of the evidence defendants' counsel requested the court to direct a verdict for the defendants. The court overruled the motion, and the defendants took an exception. Upon the argument of the motion for direction at the trial, a number of points were made by counsel for the defendants. Without abandoning those made at the trial, only two propositions were argued and presented on this motion: *First,* that Peterson, the boiler-maker in charge of the work, had no express or implied authority to furnish or provide rope and tackle or other appliance for raising the intake when he found that the rope and tackle which he had used had been taken away, and that in borrowing, providing, and rigging up a defective rope and tackle, without instructions from the defendants, and without informing them that the other had been taken away, he was acting as a fellow-servant of the plaintiff; *second,* that the plaintiff was guilty of contributory negligence in using his hands in removing the stones and dirt, instead of a stick or some other implement.

The second proposition clearly cannot be maintained. The evidence does not present such a clear case of contributory negligence as would warrant the court in taking the case from the jury. The court could not say, in view of the facts and circumstances of the case, that the plaintiff's injury substantially resulted from a danger in using his hands to remove the stones and dirt that was so obvious and threatening that a reasonably prudent man, under similar circumstances, would not have so acted. Different minds might honestly draw different conclusions from the facts. *Railroad* v. *Stout,* 17 Wall. 657. The plaintiff had worked under the control of Peterson for several days. Nothing had occurred to indicate that he was not a careful and competent man. He had been with him and worked with him before he commenced to work upon this intake. The intake had been raised to remove the uprights and lowered safely under Peterson's directions. It was dark in the place where the plaintiff was at work, and he was directed to act and remove the stones when the intake should be raised; and in obedience to orders he immediately entered upon the discharge of his duties without any appehension of danger. I think it was proper to submit this question to the jury. *Kane* v. *Railway Co.,* 128 U. S. 91, 9 Sup. Ct. Rep. 16.

The first proposition presents a more serious question. Upon well-settled principles of law the master is bound to use all reasonable care and precaution for the safety of those in his service by providing them

with machinery and appliances reasonably safe for their work, and keeping them in a reasonably safe and serviceable condition, and by providing them with a reasonably safe place to work, and by the observance of such care as will not expose the servant to unusual dangers or perils, which may be guarded against by proper diligence. These are duties which the master, as such, is bound to perform, and cannot be delegated so as to exonerate the master for liability to the servant who is injured by the omission to perform the act or duty, or by its negligent performance, whether the nonfeasance or misfeasance is that of a superior officer, agent, or servant, or of a subordinate or inferior agent or servant, to whom the doing of the act or the performance of the duty has been committed. In either case, in respect to such act or duty, the servant who undertakes or omits to perform it is the representative of the master, and not the mere co-servant with the one who sustains the injury. The act or omission is the act or omission of the master, irrespective of the grade of the servant whose negligence caused the injury. If the employe himself has been wanting in such reasonable care or prudence as would have prevented the accident, he is guilty of contributory negligence, and the employer is absolved from responsibility, although it was occasioned by the defect of the machinery through the negligence of the employer. *Railroad Co.* v. *McDade,* 135 U. S. 554, 10 Sup. Ct. Rep. 1044; McKinney, Fel. Serv. p. 87, and cases cited. Applying these principles to the facts of this case, and all the legitimate inferences to be drawn therefrom, did the court err in refusing to direct a verdict for the defendants? It is the province of the court to determine whether an inference can be drawn, and of the jury to say whether it ought to be drawn. *Randall* v. *Railroad Co.*, 109 U. S. 478, 3 Sup. Ct. Rep. 322. The contention of the learned counsel for the defendants is that the defendants did supply rope and tackle amply sufficient for the work, and that no inference of authority to Peterson to supply other rope and tackle, or other apparatus, can be drawn from the facts. If, upon all the facts and circumstances of the case, an inference of authority to Peterson in the premises cannot be fairly and reasonably drawn, the exception is well taken, and this motion must be granted. Peterson was a boiler-maker of experience. He seems to have had the confidence of the defendants as a man competent, and possessed of the requisite skill, for the work intrusted to him, and they placed him in the entire charge of the work of putting the rim onto the intake, and letting it down and riveting it to the wheel case. Plaintiff and the other common laborers were placed under his control. There were no express limitations or qualifications in their instructions to him as to the work to be accomplished or the means to be used. His express authority clearly implied the authority to use or adopt such means as might, in the exercise of ordinary care, seem to be requisite to the full performance of the work. Were the physical facts developed at the trial sufficient to exclude any implied authority to Peterson to furnish or supply the appliances used, or any appliances, for raising or moving the intake? The defendants knew, or were bound to know, that the intake was too heavy to be raised and lowered by hand, and without the assistance of

appliances suitable for the purpose; that in carrying out the instructions Peterson might, and probably would, be engaged in the work several days; and that he would, or reasonably might, require the frequent use of appliances by which to move or raise and lower the intake safely. What provisions did the defendants make for supplying the requisite appliances? The rope and tackle that were lying in the tail-race were not furnished by them for that purpose. It was lying there; but it does not appear for what purpose it was left there, nor how it came to be there. It does not appear that it was contemplated that it was to be used in or about that work at all. Peterson examined it when he found that the other rope and tackle had been removed, and found that it was too short and too small; and there is no evidence tending to show that such was not a fact. It does not appear that the defendants owned any other rope and tackle. They owned the chain which Peterson found near the work and used; but that was insufficient except in connection with a rope and tackle. Does the fact that there was a rope and tackle suspended over the intake at the time Peterson took the uprights out, together with all the facts and circumstances connected with the obtaining and placing of that tackle in position, exclude any inference of authority to Peterson to supply other rope and tackle in any event? This rope and tackle was not owned or under the control of the defendants, and was not placed in position by them. It was borrowed from the Twin City Iron-Works, and placed in position by one Spillman, who was in charge of the Humbolt mill, for the use of that mill; and when Spillman was through with it he returned it to the owners. While the rope and tackle was suspended there the defendants used it in raising the wheel case, and Peterson used it in letting the intake down at the time he took the uprights out, without objection. They made no arrangements for the continued use of it, though they knew that the work was not completed. Defendants were about there almost daily, and although it is reasonable to suppose that they knew that the Twin City rope and tackle had been taken away at least two days before the accident, they gave no instructions to Peterson about supplying other rope and tackle or appliances, or made any provisions whatever for supplying rope and tackle to be used in the completion of the work. It is claimed that the defendants, or one of them, had assisted in procuring the Twin City tackle for their own use. But it is evident that the jury found from the evidence, as they legitimately might, that defendants did not borrow it, and had no control over it, and that they did not understand that they had any right to use it at the time it was borrowed by Spillman, or at the time they gave Peterson his instructions. While it was hanging there they used it, it is true, without objection. Then Peterson used it, but they knew that they had no control of it, and had made no arrangements for using it; that it was liable to be taken away at any time; and yet did nothing respecting rope and tackle or appliance. Sunlin, who assisted in borrowing the rope and tackle for Spillman, was not the member of the firm who did or looked after the work. He did the figuring, took the jobs, and Cour, his partner, had charge of the work; and yet Cour does not seem to have given any

attention to appliances for lifting or moving the intake. The jury probably inferred that the assistance of Sunlin was simply for the purpose of finding the rope and tackle for Spillman, and that he did not borrow or assist in obtaining it for the use of himself or his firm in that work. The evidence discloses that there were two ropes and tackle, or "blocks," as they are sometimes called, used by Spillman in letting the wheel down. One was the Twin City tackle and the other one was that used by Peterson at the time of the accident, which belonged at the Humbolt mill. Spillman attempted to raise the wheel a little with his own rope and tackle, and it broke; but it was there at the mill when Peterson went to the work, and so was the Twin City tackle. They were both there, it would seem from the evidence, when Peterson received his instructions, though neither was in position, and neither of them was under the control of the defendants. Taking all the facts and circumstances into consideration, I am of the opinion that it might reasonably be inferred that the defendants intended to invest Peterson with full power and authority to do all that in the exercise of ordinary care might be requisite and necessary to complete the work, and to select, use, or provide such means as might be at hand or reasonably obtainable for that purpose. No fault seems to have been found with Peterson by the defendants because he used the Humbolt mill rope and tackle instead of applying to them for instructions, or informing them that the Twin City rope and tackle had been taken away. I do not think that the court would be justified in holding that no inference of authority to supply tackle or some appliance could be drawn from the instructions to Peterson, in view of all of the evidence and circumstances of this case.

The court charged the jury as follows in respect to this question:

"In this case it was the defendants' duty towards the plaintiff to use reasonable and ordinary care and diligence to see that the tackle used in hoisting the intake was safe and sufficient for that purpose. It was the personal duty of the defendants to furnish a reasonably safe and sufficient tackle. If they failed to furnish such reasonably safe and sufficient tackle, they were guilty of negligence, and if, by reason of such failure on their part, plaintiff was injured, without fault on his part, he is entitled to recover in this action. If you find from the evidence that the defendants left the work in question in charge and control of the boiler-maker Peterson, and left it to him to find and provide the necessary tackle, and he, in providing the tackle to hoist the intake, was guilty of negligence, either in having too short a chain, or in using a rope which was unsafe, unsound, worn out, and insufficient for lifting the weight, such negligence on his part would be the negligence of the defendants, for the consequences of which they would be responsible to this plaintiff. In that connection you will see that I have left you to find whether or not the defendants authorized the boiler-maker Peterson to furnish and provide this tackle and rope and apparatus. That is left to you. If they did not authorize him to do so, within the rules which I shall give you; if he had no authority, either direct, or which you may infer from the testimony, but he found this tackle and used it himself as a voluntary act on his part, without authority from the defendants,—then the defendants would not be liable for his negligence in furnishing it. It would be the negligence of a co-servant, and the plaintiff could not recover in this action. So you must determine the question from the evidence, under the rules which I will give you

further along, whether or not he was authorized to find and provide the necessary tackle with which to raise this intake. This is a question of fact that is submitted to you."

The case of *Wilson* v. *Quarry Co.*, (Iowa,) 42 N. W. Rep. 360, cited and relied upon by defendant's counsel on this motion, is distinguishable from the case at bar. In that case there were no facts from which any inference could be drawn that Horner, who rigged up the defective appliance, had any authority whatever in respect to the machinery. The defendants undertook the construction of a double tramway down the incline, for the purpose of running cars thereon to carry off the strippings and other refuse of the quarry down in the direction of the Des Moines river, where it was to be dumped from the cars. Before the work of constructing the tramway was completed, one Stuart, who was the superintendent of the quarry, went away temporarily. During his absence the force of men at work in the quarry rigged up a tackle and snatch-block fastened to a tree to let down loaded cars. One Horner, an employe, who was below, called up to plaintiff to go on top of the hill and get a scraper. The plaintiff brought the scraper to the upper end of the tramway, put it on one end of a car, and he and another party got onto the car and commenced to make the descent. When the weight of the car came upon the tackle rigged and fastened to the tree, the pin in the snatch-block broke, the cars descended the incline at a great speed, which resulted in their jumping from the track and greatly injuring plaintiff. The action was founded upon the alleged negligence of defendants in using defective and dangerous machinery and appliances, by reason of which the plaintiff was injured. The defendants, in their answer, denied that any defective machinery or appliances were in use by its order, etc. It appears that Stuart was the superintendent, and in charge of the quarries, and that one Washer was the foreman under Stuart, and that he was also absent at the time, but that Horner was an employe, who worked where he was directed. He sometimes gave directions to other employes in regard to work in which they were engaged, and he had charge of the tools, and kept the time of the men. There was no evidence that Horner had been invested with authority respecting the work on hand, or that he had any authority to carry on the work, in the absence of the superintendent and foreman. The court, speaking by ROTHROCK, J., says:

"It is not claimed that the defective snatch-block was put in position for use by the direction of the superintendent, nor by Washer. It is claimed, however, that, as both were absent, Horner acted in the place of the superintendent, or, in other words, acted as and for the defendant, and that the snatch-block was used by his direction, and the jury all through the instructions given them by the court were charged upon the theory that there was evidence from which such a finding could be made. We do not think these instructions were proper under the evidence, * * * because there is no evidence that Horner had authority to direct what machinery or appliances should be used. He had neither the authority of selecting nor the power to put machinery in place, and we may say, further, that there is no sufficient evidence that Horner had any agency whatever, in fact, in putting the defective snatch-block in use."

The facts of that case preclude the possibility of an inference being drawn that the defendants, either personally or through their superintendent or foreman, did, or intended to, invest Horner with authority to perform any of their personal duties respecting machinery or appliances. The case of *Lund* v. *Lumber Co.*, 41 Fed. Rep. 202, is cited by both parties on this motion. In that case, Campbell, the superintendent, was the *alter ego* of the corporation, and ordered Lynch to haul a barge out of the water; and no special instructions were given him as to the machinery for hauling it out, or as to the appliances to be used. Defendants had in their saw-mill near the barge chains and ropes, old and new, and blocks and tackle, and Lynch selected an unsafe rope, and on account of its defective condition plaintiff was injured. It was held that Lynch had authority to select the rope, and that he was negligent in so doing, and that the negligence consisted in performing the personal duty of the master. In the case at bar Peterson was given general instructions to let the intake down and rivet it onto the wheel case. This direction carried with it, by necessary implication, the authority to select and use appliances appropriate for that work, unless the fact that the Twin City Iron-Works tackle being there at the work, as disclosed by the evidence, was a full compliance on the part of the defendants with their personal duty in furnishing suitable machinery for that work. For reasons before stated, I do not think that fact, in view of the evidence in this case, was such a compliance with the defendants' personal duty as to relieve them of responsibility.

The case of *Felch* v. *Allen*, 98 Mass. 572, cited by the defendant, is not applicable. A brief statement of the case, and a single extract from the opinion, is sufficient to distinguish this case. The defendants were transferring their chair factory from the basement to the attic. Plaintiff and one Hussey, common laborers employed by defendants, were directed by the foreman to move the stock. They carried up several loads of chair-stuff in baskets, when Hussey proposed that in order to relieve them from all fatigue in going up and down stairs they should use the elevator, which ran from the basement to the attic. It was an unsafe elevator, and the rope by which it was raised and lowered was worn and defective. The rope broke while plaintiff and his co-laborer were so using it, and the plaintiff was injured. It was not used by order of the foreman or defendants, and they did not know that it was being used. It was not provided for their use, and it was not necessary to use it. The plaintiff and the other co-laborer used it simply for their own convenience, and without the knowledge or authority of the defendants or their representative. On page 574 of the opinion, Hoar, J., says:

"The case, then, is simply this, that two servants of a common master are employed upon the same work; that one of them, without authority from his master, directs the other to use a machine for a dangerous and improper purpose, for which it was not intended and provided; that he complies, and receives an injury. There is no principle of law which will make the employer answerable for the damages in such a case."

The jury have found, under the instruction of the court, that Peterson was acting under the authority of the defendants in selecting, providing, and placing the defective rope and tackle; that he negligently performed the duty; and that the plaintiff, by reason thereof, was injured. Peterson stood in the place of and represented the defendants in respect to these personal duties that rested upon them, and his acts and omissions in respect thereto were the acts and omissions of the defendants, and they must abide the result. *Anderson* v. *Bennett*, (Or.) 19 Pac. Rep. 765. The motion for a new trial is denied.

NELSON, J., concurs.