PURCELL  MILL AND ELEVATOR CO. VS KIRKLAND.

Opinion  delivered October 1, 1898.

1.  *Pleading—Amendment—Change of cause of Action.*

The first amended complaint alleged a general  employment, constituting the relation of master and servant.   The second amended complaint alleged a special employment for  a special job.   *Held*, That this was a change of the statement of the facts and not a change of the cause of action and  was permissible.

2.  *Continuance—Diligence.*

Certain depositions on behalf of  the  defendant were destroyed by the burning of the court house more than a year before the trial.   One of the witnesses whose deposition was  destroyed lived within the jurisdiction of the court, but no subpoena had been issued for him.   Defendant's attorneys had been informed before the trial that the depositions were lost.   *Held*, No sufficient diligence is shown to entitle defendant to a  continuance.

3.  *Evidence—Exception to  General.*

An objection to testimony which does not  point  out  the  testimony objected to, is too general and will not be considered.

4.  *Negligence—Refusal of Special Instructions Not Error.*

The general charge of the court fully instructed the jury on  the subject of contributory negligence and it was not  error  to refuse a special charge covering the same  ground.

5.  *Verdict—Sufficiency of Evidence to Support.*

When there is any conflicting evidence to go to  the  jury,  their verdict will not be disturbed.

6.  *Defect in Appliance—Promise of Master to Correct,*

Plaintiff informed defendant that a wire rope,  attached  to  the top of defendant's smoke stack, and used  to  carry  persons to the top thereof, was rusty.   That some  of  the  strands were

broken. Plaintiff asked defendant to get a new rope. Defendant asked how long it would take to get a new rope. He told plaintiff that the rope was insured for five years and had only been used one year. *Held*, This did not amount to a promise on defendant's part to get a new rope.

*7. Negligence of Master for Failure to Inspect.*

Defendant was informed by plaintiff that a wire rope, which had been suspended from a smoke stack for a year was defective. It had been insured for five years. Plaintiff had cut off parts of the rope which were obviously defective. *Held*, Defendant was guilty of negligence in not inspecting said rope for latent defects.

*8. Contributory Negligence.*

Plaintiff discovered certain parts of a wire rope to be used by him in hoisting himself to the top of a smoke stack to be de fective. He cut that part of the rope off. He took his knife and untwisted the wire at places and did not discover the latent defect which afterward caused his injuries. He did not test the rope with heavy weights to ascertain if it were safe. *Held*, He was not guilty of contributory negligence.

*9. Appliance—Wire Rope Is.*

A wire rope attached to the top of a smoke stack for the purpose of hoisting persons to the top thereof is an appliance which it is a master's personal duty to keep in repair.

*10. Master Negligent for Failing to test Ropes.*

The defect in a wire rope consisted of the inside wires having rusted out. The outside strands were bright. The defect could have been discovered by the master by testing the rope with weights. *Held*, He was guilty of negligence in not doing so.

*11. Employee may Rely on Master's Representation.*

An employee has a right to rely upon the assurance of his employer as to the safety of appliances with which he is to work, and he is not guilty of contributory negligence even though he might by testing the appliance have discovered its defective condition.

*12.  Excessive Judgment.*

A judgment for $12,500.00 for injuries to a workman who is 52 years old, and unable to earn full wages is excessive.

Appeal from the United States court for the Southern district.

C. B. KILGORE, Judge.

Action by George W. Kirkland against the Purcell Mill & Elevator Company.   Judgment for plaintiff.   Defendant appeals.   Affirmed on condition of remittitur.

This was an action brought by the plaintiff below; appellee here, to recover the sum of $25,000 damages for personal injuries sustained by him while in the employ of the defendant below, appellant here; which injuries, it is alleged, were caused by the negligence of the defendant because of the failure to provide for him proper implements, machinery, etc., with which to perform his work.   We do not deem it necessary to set out the pleadings.  · They contain the usual averments and denials found in this class of cases, and which, in this jurisdiction at least, have been reduced almost to a formula.   The facts of the case, as shown by the proof admitted in the evidence at the trial, are that the plaintiff was employed by the defendant to paint a smoke stack attached to its mills, for the sum of $10; that this smoke stack was from 50 to 60 feet high; and that there was attached to it, suspended from the top, a wire rope used for the purpose, when necessary, of carrying persons from the bottom to the top.   It had been there for about one year, but was only used occasionally.   This fact was known to the plaintiff.   There was proof to show that the defendant was to furnish the plaintiff with all the necessary implements, etc., but was not to erect any scaffolding or to arrange any

of the appliances for ascending or decending during the progress of the work. The windlass and other things necessary for the work, including the rope, were about the mill, subject to be used by plaintiff. Previously he had been around the mill, had done some work there, and was somewhat familiar with the surroundings. He was a carpenter. On the day of the accident plaintiff and his son-in-law, John H. Graham, went to the mill for the purpose of doing the job, and told Mr. Trudgeon, who was defendant's manager, and had charge of the mill, that he was ready to paint the stack. He was told by Mr. Trudgeon, who was at his office, to go down to the mill, and get whatever he wanted necessary for the work. He did so, and while fastening the rope to the windlass he discovered that a part of it, which had been lying near the exhaust pipe of the engine, was defective, caused by the escape of the steam. This part he cut off. In his testimony he says: "I cut off a whole lot of it." They then examined the balance of the rope, "clear round, from one end to the other"; and although they found some slightly rusted places on it, and a place where it was slightly cut from some cause, he came to the conclusion, he says, that it was "pretty sound—a pretty good rope." Still, he says, he had some doubt about it, and asked Graham, his son-in-law, his opinion. Graham responded that he would not go up there on any rope. He (Kirkland) then went to the office to see Trudgeon, the manager, for the purpose, he says, of getting his opinion. As the conversation which took place at this time is very important in this case, we will state in the plaintiff's own language: "I told him I had come down to have him see about the rope. He says, 'What rope.' I told him the rope at the top of the smoke stack. 'Well,' he says, 'what about that rope?' I told him I just wanted his opinion about it— that is all; it was a little rusty. He says, "Was it rusted in two anywheres?' and I told him, 'No, it was not rusted in

two anywheres.' I told him I found a few strands of wire that was broken, and a few that the wire was cut—a strand looked like it had been cut on something, but it seemed to be good. He said that was a funny idea. I told him I didn't know that it was, or something to that amount. He said that the rope was all right. He told me that it would not rust. I cut off the lower end of it and threw it away. He said it was galvanized steel wire; it would not rust. I spoke to him about getting a new rope. I said: 'Mr. Trudgeon, why not get a new rope, and put it there. How long would it take?' He says, 'It would not take a great while to get a new one.' I says, 'Why not get one, then? He says, 'That might do.' Well, I was about leaving, and started out. He told me that rope was insured for five years. While he was talking with regards to it he seemed to think I must be afraid of it, or something of the kind, so I got to believe I was suspicious myself. That was about all the conversation there was about it." This was about noon, and he concluded not to take the ascension until after dinner. Immediately after dinner they came back, and he made the ascension safely. Then he went to the blacksmith shop to get a hook repaired, came back, and made another ascension. Immediately afterwards, while making the third ascension—this time with the additional weight of some rope and a block and tackle, which he took up with him, the block and tackle weighing 75 pounds, and the rope not being weighed, but being about 100 feet long—when about half way up, the rope broke, and he fell upon the roof of the engine house, a distance of some 30 or 40 feet, receiving very severe injuries. The rope was afterwards examined, and it was found that at the place where it broke all of the wires, except five or six strands on the outside, were rusted off. Those on the outside had the same appearance of the rest of the rope. No defects could be seen, nor were they discovered on the examination made by plaintiff and Graham before

the accident, when they used a knife to pry open the strands in a number of places, but always fonnd the wires bright and sound on the inside.

A motion was filed to strike from the files the second amended complaint upon the ground that it was "wholly at variance with the other complaints previously filed in the case;" "that in the first petition, as first amended, plaintiff declared on a contract of general employment, and that the relation of master and servant existed between the plaintiff and the defendant, and that he was injured in the course of his employment as servant of the defendant, "etc. "and in the second amended complaint plaintiff declares upon a separate and independent contract that he was to paint a certain smokestack for the sum of ten dollars," etc. This motion was overruled, and exceptions duly saved. Thereupon a second motion was filed, to strike out the said inconsistent part of the second amended complaint, which was overruled, and exceptions saved. Defendant then filed a demurrer to the second amended complaint, setting up the same ground as that passed upon in the motion. This demurrer was overruled by the court, and exceptions saved. Thereupon a motion for continuance was filed, setting up that the said change in the pleading worked a surprise to it, which was overruled, and exceptions saved. When the case was called for trial, and after the plaintiff had announced himself ready, the defendant stated that it was not ready, and it was then agreed, in open court, that its counsel might state verbally the grounds upon which he relied for a continuance, and after the trial reduce them to writing in the shape of a motion for continuance, and file the paper in the case. The grounds were stated, and the court overruled the motion, which was duly excepted to. The motion, as afterwards filed, set up the fact that there had been two depositions taken of parties who were present at the time the rope was

examined by the plaintiff and Graham. That at several places the strands of said wire rope were rusted entirely off. That after plaintiff had come back from seeing Trudgeon he told them he (Trudgeon) had said that "it is funny that the wire rope is rusted; it can't rust; it is guarantied for five years." They then tested the rope by hanging a weight as heavy as three men to it. Afterwards they examined it further, before it was used by them. The witness then told plaintiff that he had seen such ropes used in Oregon in the mines with half the strands rusted, and that this rope would sustain a weight five times more than they would want to carry by it. That these depositions were lost, but counsel for defendant were not aware of it until the case was called for trial. That if the fact of their loss had been known to them they would have procured others to have been taken. That, upon inquiry since, counsel had learned that they had not been seen by any one since the Ardmore fire. That the testimony was material, etc. This paper was sworn to by J. W. Hocker, Esq., one of the defendant's counsel in the case. Mr. R. N. Coffee, one of the counsel for plaintiff, filed a controverting affidavit against the motion for continuance, in which he stated that, at the time Mr. Hocker made his verbal motion, he admitted that the depositions of the witnesses had been destroyed in the Ardmore fire, in April, 1895, more than one year before, and that that fact was known to counsel for defendant; that one of the witnesses lived within the jurisdiction of the court, and could have been reached by subpœna; that facts alleged in the motion as having been testified to by these witnesses were different from those as stated in the depositions. Judge Kilgore, who presided at the trial, in a note over his signature, embodied in the bill of exceptions, sustains the recollection of Mr. Coffee as to the fact that defendant's counsel were aware of the fact that the papers had been burned more than a year before at the Ardmore fire, and that no effort had been made

to retake or substitute them. There were no exceptions saved to the charge of the court.

Among the instructions asked for by the defendant was the following: "You are instructed that by the term 'contributory negligence' is meant the want of ordinary or reasonable care upon the part of the person injured, which concurred with the negligence of the defendant in causing the injury." This instruction was refused, and exception saved. Verdict for plaintiff for $12,500. Motion for new trial filed, overruled, and exception saved. Judgment for plaintiff for amount of verdict. Appeal prayed for and granted.

*Hocker & Woods* and *Stuart, Gordon & Hailey*, for appellant.

*R. N. Coffee, Furman & Herbert*, and *Jesse H. Hill*, for appellee.

CLAYTON, J. In this jurisdiction the statute governing appeals does not require that any assignments of error shall be filed. It does provide, however, that a motion for new trial must be filed, and passed on by the court below, and be brought up to this court by the bill of exceptions, and, when so brought up, it answers the purpose of an assignment of errors. In this case the motion for new trial is as follows: "The defendant moves for a new trial, because —First. The verdict is not sustained by the evidence. Second. The verdict is contrary to law. Third. The court erred in overruling the demurrer to plaintiff's second amended complaint. Fourth. The court erred in overruling defendant's motion to strike plaintiff's second amended complaint from the files, because of the variance between that complaint and the former complaint. Fifth. The court erred in overruling defendant's motion for continuance, after plaintiff's cause of action had been changed by the filing of

the second amended complaint.    Sixth.    The court erred in overruling defendant's motion to strike out the inconsistent paragraphs in plaintiff's said amended complaint.    Seventh. The court erred in overruling defendant's motion for a continuance after the plaintiff had announced ready for trial, and defendant had discovered the loss of depositions taken in the case.    Eighth.    The court erred in admitting testimony over the objection of defendant, as shown by the bill of exceptions.    Ninth.    The court erred in refusing instruction No. 6, asked by the defendant.    Tenth.    Because said verdict is excessive and shows prejudice on the part of the jury."

We will leave the first, second, and tenth of the errors above assigned to be last considered, and dispose of the others in the order stated in the motion for a new trial; and, inasmuch as the demurrer mentioned in the third assignment attacked the second amended complaint on the same grounds as the motion mentioned in the fourth and fifth, and the motion for continuance in the sixth, assignments, we will consider them together.

It is argued that, because the second amended complaint alleged that the plaintiff's employment was special,— that he was to perform a single job,—and whereas the first amended complaint alleged that his employment was general (thus invoking the law of master and servant,) this constitutes such a variance from the preceding pleading as the law will not permit by amendment.    While the law of pleading will not allow an amendment which has the effect of changing the cause of action from that stated in the original complaint, we know of no law, nor has any been cited, which prohibits a change, in the amended complaint, of the statement of facts relating to the same cause of action.    Indeed, this is often the very object of the amendment, and, under

(12)

our statute, is allowed even during the trial, if it does not work a surprise, and then it would only be a ground for continuance; and as this amendment was filed eight days before the trial, as shown by the record, and in this particular **Pleading.** only changed the preceding amended complaint as to the **Amendment.** facts stated therein, to wit, that the plaintiff, instead of having been a general employe around the mill, as first stated, was only employed to do specially the labor necessary to the performance of a single job, we cannot agree with the learned counsel that this is prohibited by the law, or that it would work such a surprise as would entitle them to a continuance, which, if not allowed, would constitute an abuse of the discretion allowed the court in passing on motions for continuance.

The seventh assignment is that the court erred in overruling defendant's second motion for continuance, which set up the loss of the depositions of his witnesses theretofore filed in the case. It must be conceded that, if the facts which the motion shows the witnesses had testified to in the depositions were true, they were material. But the affidavit of Mr. Coffee denies that the depositions contained the statements claimed by the motion; but, conceding that they were as stated, was there any diligence shown by defendant in procuring this testimony after knowledge of the loss of the depositions? If the written motion, which, by agreement, was written and filed after the trial, contains the real motion as verbally made, there might be some grounds for the claim that diligence was shown. Even then, when it is remembered that, a year before, they had been destroyed by fire in the burning of the court house, and that their loss had not been discovered until the day the case was called for trial, it seems to us a remarkable degree of diligence is not shown. But, be this as it may, the affidavit of Mr. Coffee, supported by the recollection of the trial judge, is to the effect that counsel, in the real motion for a continuance, admitted that

they had theretofore been advised of the loss of the deposi-
tions, and that one of the parties was then living within the
jurisdiction of the court, and could be reached by subpœna.
It is not for us to determine which version of the matter is
correct. The court in whose presence the verbal motion was
made has passed upon it, and it is conclusive as far as this
court is concerned. The court found that diligence had not
been used, and there was evidence to support its findings, Continuance.
and therefore the refusal to grant the continuance was not court.
an abuse of its discretion. A motion for continuance is in
the sound discretion of the court, and, unless that discretion
has been abused, a refusal to grant the motion is not reversi-
ble error. Burriss vs Wise, 2 Ark. 33; Stillwell vs Badgett,
22 Ark. 164; McDonald vs Smith, 21 Ark. 460; Harsh vs
Hanauer, 15 Ark. 252; Hunter vs Gaines, 19 Ark. 92; Rector
vs Gaines, Id. 70; Ware vs Kelly, 22 Ark. 441. Under the
circumstances of this case, we cannot see that the discretion
resting in the court to grant or overrule the motion for a
continuance was abused.

The eighth assignment does not point out what testi-
mony was objected to, and therefore is too general to be Exceptions.
Too indefinite
considered. It points to nothing, and is too indefinite.
Edmonds vs State, 34 Ark. 720. This assignment is not
urged by counsel.

The ninth assignment is that the court erred in refus-
ing to give instruction No. 6 asked for by the defendant.
The general instructions of the court fully and fairly defined
"contributory negligence," as applied to this case. The
seventh and ninth instructions of the court, as given, are as
follows: "(7) The duty was on the plaintiff to exercise
ordinary care and diligence in his efforts to discover defects
in the wire rope, and, if he failed to exercise such ordinary
care and diligence, he thereby contributed, by his own
negligence, to the injury which he sustained, and he would

not be entitled to recover." "(9) When the plaintiff undertook the work of painting the smokestack by virtue of the contract, he subjected himself to the ordinary peril incident to such services; and, if he undertook the work with notice and knowledge of the danger, he is deemed to have accepted the services and the danger too." We find no error in refusing the instruction asked for.

The first assignment is that "the verdict is not sustained by the evidence." The rule governing this court upon this question is that the court will not reverse the decision of the court below, refusing a new trial, when the only ground presented is the mere weight of evidence, unless there is a total want of evidence upon some point absolutely necessary to a recovery, or unless the verdict is clearly and palpably contrary to the weight of evidence. When there is a conflict of evidence, the jury being the exclusive judges of facts, their verdict will not be disturbed. Drennen vs Brown, 10 Ark. 138; Sparks vs Beaver, 11 Ark. 630; Bank vs Wooddy, 10 Ark. 638; Gatlin vs Wilcox, 26 Ark. 309; Oliver vs State, 34 Ark. 632.

It is claimed by the plaintiff that the conversation had between him and Mr. Trudgeon, the manager of defendant's mill, just before the accident, amounted to a promise to repair on the part of the defendant, and that, relying on the promise, the plaintiff had the right to continue the work with the defective rope. But it must be remembered that the work was but a mere job that would take but a day or two to complete; and, if the language could be construed to amount to a promise, it was not a promise to simply repair, but to supply an entirely new rope. If the understanding was that a new rope was to be supplied, then this was a condemnation of the old one, which would relieve the defendant from any further inspection of it, because it was no longer to be used. And this must have been understood by the one as

*Verdict. Conflict of evidence.*

well as the other; and if, under these circumstances, the plaintiff, without giving the defendant time to make his promise good, and without any further instructions from him, notwithstanding the understanding, should see fit to take the chances and use the old one, it would clearly be at his own risk. Under such circumstances, the defendant would be without fault, and this would be the end of the case.

But did the aforesaid conversation amount to a promise to repair or to supply a new rope? We think not. The conversation commenced by plaintiff telling Mr. Trudgeon that he came to see him about the rope,—to get his opinion of it; that it was a little rusty,—not rusted in two anywhere, but that a few strands of wire had been broken and a few were cut; looked as if they had been cut on something, but it seemed to be good. Mr. Trudgeon replied that that was a funny idea. The plaintiff responded that he did not know that it was, or something to that amount. Mr. Trudgon then said: "The rope is all right; that it would not rust; that it was galvanized steel wire; it would not rust." Plaintiff then suggested that a new rope be gotten, and asked how long it would take to get one, to which Mr. Trudgeon replied, "Not a great while." The plaintiff then said, "Why not get one?" The reply was, "That might do," and as the plaintiff turned to leave he was told that the rope had been insured for five years. And this was the whole conversation. We fail to find any element of promise in it. The whole purpose of Mr. Trudgeon seems to have been to impress on the mind of the plaintiff the impossibility of the rope being defective on account of rust. He made light of the suggestion that it was defective; said that it was a funny idea; "that the rope was all right"; that it was made of galvanized steel wire, and would not rust." When a new one was suggested, he said, "That might do," but it had been insured for five years, and both knew that it had been in use but one. The

plaintiff himself had said to him that, notwithstanding the few defects, he found that the rope seemed to be good. The argument made by Mr. Trudgeon seems to have satisfied the mind of the plaintiff, and to have dispelled all of his misgivings; for he says that he went back from the office where the conversation was had, to the smokestack, and concluded to make the ascension.

"Mere suspicions and surmises or belief that the defects will be remedied do not take the place of a promise to remedy them. There must be something emanating from the employer to induce a belief that the defects will be remedied." 1 Bailey, Mast. Liab. 3076. The after-conduct of the plaintiff is conclusive evidence that he did not believe a new rope was to be supplied.

Taking the view that the language used did not amount to a promise, either express or implied, we are called upon to determine whether the evidence of defendant's negligence in not providing a rope sufficient for the purpose, and in not properly inspecting the one used, was sufficient; and, if so, was there any evidence of contributory negligence on the part of the plaintiff? and, if so, was it clearly and palpably against the weight of the evidence on this point as to show that the court committed error in refusing to grant the motion for a new trial? So far as the defendant is concerned, we think it obvious that he had not performed his full duty. The wire rope had been suspended from the smokestack, subjected to the influences of the weather for one year. It may have been insured for five, but he had been informed by the plaintiff that it had been examined, and that there were defective places in it, and, notwithstanding his own views were that a galvanized steel rope would not rust, he had been informed that this particular one did. In the case of *Railway Co. vs Harper*, 44 Ark. 528, the court say "that, if the company omitted any test of soundness of

the boiler that ought to have been made, it was guilty of neg-ligence, and it was not for the court to take the case from the jury." In this case the ordinary and simple test of ap-plying the additional weight had not been made; but, in-stead of inspecting it himself or having it done, he satisfied himself by arguing away the fears of the man who was to perform the perilous duty of making the ascension. Had he made the inspection, and applied the common test in such cases of suspending to the rope a weight many times heavier than that to be used in the work, the defect would probably have been found. He cannot relieve himself of the respon-sibility upon the ground that the defect was latent, and that an inspection such as should have been made would not have discovered it. The probabilities are that it would, and, not having applied the test, he will not now, after the acci-dent and a verdict of the jury against him, be allowed to say that it would not. The rope held the plaintiff, who had made two ascensions on it, but when the additional weight of the rope and tackle was added it broke. A latent defect may excuse the employe for not having discovered it by the use of such ordinary care as the law requires on his part, but they are the very kind of defects which the employer is required to find if, by proper inspection and by the use of such care and diligence as the law requires of him, they can be found; and he can only escape responsibility on this ground when it is shown that a proper inspection would not have discovered them. And in this case this question was fairly submitted to the jury by the charge of the court in its eighth instruction, which is as follows: "If you should conclude from the evidence that the Mill & Elevator Com-pany contracted with the plaintiff to furnish safe and reli-able appliances for the work, and that it did furnish the ap-pliances, and was ignorant of the defects in the same, and could not by reasonable diligence ascertain the defects, then the defendant would not be liable." We think there was

evidence supporting the verdict on this point, and therefore cannot interfere with it.

Was the plaintiff guilty of contributory negligence? He testified that he was not familiar with wire ropes; and we do not think that a rope of this description, used as this was, was an appliance of such simple construction and of such common use as that the common employe, not in the habit of using it, shall be considered as capable of knowing and understanding its mechanism, and of observing and discovering defects that may exist in it, as to take it out of the rule of a master's personal duty. In the case of *Telander vs Sunlin*, 44 Fed. 564, a rope connected with a tackle block was held to be such an appliance as came within the rule of a master's personal duty. In Lund vs Hersey 41 Fed. 202, a rope which a foreman selected from a quantity on hand for use in hauling a barge from the water was held to be within the term "appliances." See, also, Baker vs Railroad Co., 95 Pa. St. 211. Of course, much will depend on the purposes for which it is used. If it constitutes a part of a structure, as of machinery, which is most vital to the safety of the workman, then, however simple its construction, the personal duty of the master to make it strong and safe, and keep it so, is obvious. The very purpose for which this rope was used made it an "appliance," within the rule.

The proof shows that the defect in the rope at the place where it broke consisted of the inside wires having been destroyed by rust. The outside strands were bright, and had all of the appearance of soundness. The plaintiff, and those who were with him, had made a pretty thorough examination of it, but failed to discover this defect. They found one place where a part of the rope had been lying near the escape valve of the engine that was so badly rusted that they cut it off and threw it away. They found other places where some rust appeared on the outside, but, upon

*Appliance. What is?*

full examination, decided that this did not materially lessen its strength. With their knives they opened the strands in places, and always found the inside bright and sound. The evidence does not show, however that they attached any weights to it to test its strength in that way. But still they discovered enough to excite the fears of the plaintiff. He became at least suspicious of its soundness. What was his duty under these circumstances? It may be said that he should have applied the other tests. But it must be remembered that the actual defect was latent, and the test, as far as made, showed no great defects, and that he did not choose to take the risk without informing his employer of the condition of the appliances. But he had two other courses open to him—he might quit the work, or he might report the condition of the appliances to his employer. The actual defect not being obvious, the plaintiff chose the latter course. It became then the duty of the employer to inspect the appliances, and learn its condition himself. Or, if he preferred to rely on his own judgment or knowledge, he might have taken upon himself the responsibility of assuring the employee of its soundness and sufficiency; in which latter case; under the circumstances of this case, the employe might proceed with the work; and if he did so relying on the assurances which he had received, and was afterwards injured because of these defects, the fault was the employer's, and the employe would be guilty of no negligence—he would have done his full duty under the law. Bailey, Mast. Liab. 898 et seq.; 3 Elliott, R. R. 2072, 2073.

*Master and servant. Duty to inspect.*

The questions as to whether the language used by defendant, as above set out, was such an assurance, and as to whether the plaintiff really relied upon it when he proceeded with the work, were both fairly submitted to the jury by the fifth instruction of the court, which is as follows: "If, on the other hand, you should conclude from the testimony that the Mill & Elevator Co. bound itself to furnish the ma-

chinery and appliances necessary to enable the plaintiff to carry on the work on a swinging scaffold, and that they did furnish such necessary appliances, and represented them to be safe and sound, and that they could be safely used in the work, and that the plaintiff relied upon the representations of the defendant upon that subject, and was unable to discover such defects as would make them unsafe, it would be your duty to find for the plaintiff. " We cannot say, as against the verdict of the jury, that it was the duty of the plaintiff, under the circumstances, to have made further examination before proceeding with the work, or in doing so he did it at his own peril. He had gone far enough to discover that there were no apparent defects that were serious except at the place where the rope was exposed to the constant dampness caused by the escaping steam, and he had removed that. The actual defect was not visible. The rope had been insured for five years, and had been used but one. He had been told by his employer that it was all right, and that the material of which it was made was galvanized steel, not subject to rust. Aside from the place where the steam had caused it to rust, which had been removed, the defects were slight and immaterial. The inside, wherever it had been examined, was bright and sound. He had taken the caution of submitting the matter to his employer, who virtually adopted his inspection, and deemed it sufficient. These facts were all before the jury, and their verdict is conclusive on us.

*Verdict conclusiveness.*

But, while the plaintiff was seriously injured, taking into consideration his age—he was 52 years old—and his neccessary inability to earn full wages, and all of the circumstances of the case, we think the verdict of the jury excessive. If the plaintiff will remit the amount of $7,500 within 15 days from this date, allowing the judgment to stand for the sum of $5,000, let the judgment be affirmed; otherwise let it be reversed and remanded.

SPRINGER, C. J. and TOWNSEND, J., concur.