DETERMINED IN THE

## SECOND DISTRICT

OF THE

# APPELLATE COURT OF ILLINOIS,

### DURING THE YEAR 1904.

---

### Alvin C. Bowen v. Chicago & Northwestern Railroad Company.

#### Gen. No. 4,262.

1. MOTION TO DIRECT—*what cannot be considered upon.* The trial judge under the rule prevailing in this state is not authorized to weigh conflicting testimony in deciding a motion to direct a verdict.

2. MOTION TO DIRECT—*when, may be granted.* It is proper for the court to direct a verdict for defendant, if the proof does not fairly tend to make a case for plaintiff.

3. ASSUMED RISK—*when doctrine of, does not apply.* The rule that a direction by the master to continue the use of a defective instrument coupled with a promise to replace it with one not defective relieves the servant from the doctrine of assumed risk if injured during such continued use and because of the defect, does not apply to the use of simple implements with which the servant is entirely familiar.

Action on the case for personal injuries. Error to the Circuit Court of DeKalb County; the Hon. CHARLES A. BISHOP, Judge, presiding. Heard in this court at the October term, 1903. Affirmed. Opinion filed November 12, 1904.

JONES & ROGERS, for plaintiff in error.

D. J. CARNES, for defendant in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

This is an action brought by Alvin C. Bowen against the Chicago and Northwestern Railway Company. The amended declaration averred plaintiff was foreman of de-

fendant's car department at DeKalb, with the duty to inspect and repair the cars, and that it was defendant's duty to furnish for his use suitable tools with which to inspect and repair cars; that while plaintiff was inspecting and repairing a certain car, the lever of a Joyce jack struck plaintiff on the side of the head and neck, causing partial deafness, great pain and a permanent injury; that the ratchet and notches of said jack had become so worn that it would not properly hold and the bolt going through the ratchet was broken, and by reason thereof the use of said jack in lifting a car became dangerous; that it was plaintiff's duty to notify defendant of the imperfect and defective condition of said jack, and he did so notify defendant and requested a suitable tool with which to do the work for which said jack was used; that thereafter, and shortly before said injury, defendant promised to furnish plaintiff a suitable tool with which plaintiff could safely perform his duties, and requested plaintiff to remain in its employment until such time; that plaintiff relied upon such promise and did remain in defendant's employment a reasonable time; that defendant had full knowledge of the defective condition of said jack and knew it was liable to injure any of its employees, and especially plaintiff, while in the ordinary and careful use of the same; that plaintiff's injury was caused by the defective condition of said jack while plaintiff was using all due care, skill and caution in the use of the same; that defendant did not supply plaintiff with a suitable appliance for said work, and through defendant's negligence in failing to supply plaintiff with a suitable appliance to perform defendant's work plaintiff was injured without his fault. Defendant pleaded not guilty. At the first trial the jury disagreed. At the close of all the proofs at the second trial, the court, on motion of defendant, directed a verdict for defendant, and such a verdict was rendered. A motion by plaintiff for a new trial was denied. Defendant had judgment for costs. Plaintiff has sued out this writ of error to review said judgment.

In certain particulars the evidence was very conflicting.

Plaintiff testified he was told in the latter part of 1899 or fore part of 1900, that this jack had slipped; that he then wrote the general store-keeper about it, asking another jack; that it slipped again in September and he then sent a requisition upon the store-keeper for a jack, which was returned with a letter saying defendant did not have the size he called for; that he sent the requisition and the letter from the store-keeper, with a letter from himself, to the superintendent of the car department about October 1, 1900; that he thereafter spoke to the traveling car inspector about the jack being worn, and about the requisition and the letter to the superintendent, and the traveling inspector told plaintiff to go on and use the jacks and do the best he could and he would take the matter up with the superintendent of the car department as soon as he got in, and have some sent out or see if he could not hurry some out; that the second day after plaintiff was hurt he made out a report of his injury and sent it to the general claim agent; that he afterwards talked with the superintendent of the car department about said injury; and that until he received the blow upon his head of which he here complains he had had no trouble with his ears. In each of these respects plaintiff was sharply contradicted by the proof introduced by defendant. We do not deem it necessary to refer to this testimony further than to say that if the jury had returned a verdict, specially finding that plaintiff reported this jack and ordered another from the general store-keeper, wrote the superintendent that these jacks were worn, and so informed the traveling car inspector and received from him directions to continue to use them, coupled with a positive or conditional promise to send out another jack, that he was seriously injured by the blow of which he here complains, and that he reported the injury to the claim department, it is not easy to see how the court could have sustained such findings.

But the rule prevailing in this state does not permit the trial judge to weigh conflicting testimony in deciding a motion to direct a verdict. I. C. R. R. Co. v. Heisner,

192 Ill. 571; Ackerstadt v. Chicago City Ry. Co., 194 Ill.
616; Missouri Malleable Iron Co. v. Dillon, 206 Ill. 145.
The fact that plaintiff was so seriously contradicted did not
warrant the trial court in directing a verdict, but it was
required to submit this conflicting proof to the jury, if in
all other respects there was proof tending to make a case
for plaintiff. But the conflict above referred to did not
touch upon two material questions, viz.: *first*, whether the
jack in question was so worn or otherwise defective that it
was dangerous to use it, as alleged in the declaration; and
*second*, whether, if plaintiff continued to use it in reliance
upon a promise by the traveling car inspector to send
another, and was injured by reason of its defect while so
using it, defendant would be liable to him for that injury.
A careful study of the testimony in the record itself con-
vinces us there is in most respects no substantial disagree-
ment in the proof upon these subjects, and therefore
defendant's motion to direct a verdict, presented for decis-
ion the question whether the testimony on these subjects
fairly tended to make a case for plaintiff.

After serving defendant in several other capacities, in-
cluding that of car repairer at DeKalb, plaintiff became
foreman of defendant's car department at DeKalb at least
fifteen years before the injury here sued for, and plaintiff
served defendant continuously in that position till this
injury. As such foreman he had charge of all car repair-
ing gangs at that station, both those working by day and
those on the night turn. He therefore had large experi-
ence in that line of work. At the time in question plaintiff
had under his control and in his use at DeKalb five screw
jacks and two Joyce jacks. The screw jacks worked very
slowly, and were generally used only to lift heavy loads.
The Joyce jacks were also called ratchet, lever and pump
jacks, and were worked by a lever operated like an old-
fashioned pump handle. These were only used to raise
empty cars or light loads. When this jack has been placed
under an object which it is desired to raise, the operator
presses the lever down and thereby raises the object about

three-quarters of an inch, and then a dog or block drops into a ratchet or socket which stands at an angle of forty-five degrees, and which holds the load securely at the height thus gained. This operation is repeated, and the dog sinks into the next higher notch, and so on till the object has been raised to the desired height. These two Joyce jacks were put in use at DeKalb after plaintiff became car repairer there and before he became foreman, and they were continuously used by him and the men under him from the time he became foreman till he was injured. That use varied from every day to three or four times a week. In the latter part of 1899 or fore part of 1900, plaintiff was told by one of his men that one of these lever jacks had slipped. Plaintiff examined it and found it a little worn. He claims he then wrote the general store-keeper for another. A chalk mark was placed upon it, partly so that he and his men would know it when they used it, and partly to warn the section men, who sometimes took a lever jack from the tool house for use in their work and who were ignorant concerning the use of such jacks. Plaintiff and his men continued the use of the jack. In September, 1900, it slipped again and plaintiff claims he made the requisition on the store-keeper, and in October wrote the letter to the superintendent of the car department, and had the conversation with the traveling car inspector, already stated. He still continued to use the jack. On October 13, 1900, James Shaw and plaintiff's son Elmer were working under plaintiff in the day gang. Plaintiff sent them to get ready to repair the west end of a car standing on the repair track. They got the two Joyce jacks, placed one under the southwest corner and the other under the northwest corner and raised that end of the car. The men did not know under which corner they placed the marked jack, but plaintiff testified that after he was hurt he noticed it was the marked jack which hit him. When plaintiff came the car was jacked up several inches higher by his order. Elmer then gave the jack a kick, pulled out the lever and laid it on the ground.

Plaintiff then went under the car and repaired it. He then said, "All right, let her down," and crawled out between the northwest jack and the brake rod. Meanwhile Elmer had taken the lever from the ground and placed it in position, and stood waiting for Shaw to help him lower the car. Plaintiff stepped a little closer to the northwest corner of the car to take a screw out of the car. At that instant the lever of the jack flew up and hit plaintiff a glancing blow on the side of his head and neck, knocking him down and inflicting the injuries for which this suit is brought. No one knew why the lever flew up but the proof seems to warrant the conclusion that the dog had stopped on the lip or edge of the socket and had not slipped into the socket, and that at that instant something caused the dog to slip off the edge and fall to the next notch below, which movement would cause the handle to fly up. Whether the dog failed to slip into the socket because the jacket was worn, or because it was dry and had not been kept sufficiently oiled, or because the lip or edge was gummed up, is matter of conjecture.

The proof, both from plaintiff and from defendant, shows there is always some danger that the dog or block of a lever jack may not drop completely into the socket, and if this is not noticed and remedied it may slip, and if it slips when it is supporting a load and the lever is in place the lever will necessarily fly up, and any one in the way will be hit. Shaw, who had worked under plaintiff about ten years, testified for plaintiff that for this reason it was always rulable wherever he had been, to take the lever out after the car was raised, and that any one working with that kind of a jack must know the lever is a little dangerous. Elmer Bowen testified for plaintiff that it was his place to watch the ratchet; that his father was ready to go under this car when they finished jacking it up, and Elmer then kicked the ratchet to make sure of it, and then pulled out the lever as a protection against its flying up; and that it was always their practice, with the safe jack as well as with the one that was worn, to take out the lever, because,

even with the safe jack, something might happen that it would slip. Testimony introduced by defendant, and not disputed by plaintiff, showed that the working part of the Joyce jack is always in sight, and that it is intended to be worked by sight; that it will sometimes happen that the dog will not slip into the socket of its own weight, as, if the edge is dry and not oiled frequently, as it should be, or if a gummy substance forms upon it, causing the dog to stop and stick upon the edge; that if the men using the jack look at it they can see when the dog does not slip into the socket, and a slight force applied by hand or foot will push it in; and when it is in place it cannot slip while the weight is upon it unless lifted out by the use of the lever; that it is at all times the duty of those operating a lever jack to see that the dog or block goes into the socket, and if it does not, then to force it in with the fingers or the foot; that when there is a load on, one can tell by the sound when it does go in, and can see if it does not go in; that the handle will fly up on any lever jack unless the operator is careful; that the jack here in question was entirely safe to use if the operator watched it, and that it is not safe to use any Joyce jack without watching to see if the dog drops into place as the load is lifted. Therefore the testimony of Elmer Bowen that it was his place to watch the ratchet, and that when they finished jacking up the car he kicked the ratchet to make sure, shows that plaintiff and his gang knew the necessity for pursuing that course with any Joyce jack; that plaintiff had directed Elmer to watch the ratchet to see that the dog dropped into its place, and that Elmer either kicked the ratchet because he saw the dog had not dropped into place, or did not take the trouble to look, but kicked it to make sure. While plaintiff testified he did not use that jack again, and that after the injury he told the men not to use the Joyce jack at all, his witness Shaw, who worked under plaintiff, testified he used it right along during the fourteen months after the injury that plaintiff remained there as foreman. When Hall became foreman in December, 1901,

plaintiff, at defendant's request, stayed several days to show Hall the duties of the position, and plaintiff showed Hall how to do the work, but did not tell him this jack was dangerous or defective, although he showed the jacks to Hall. Hall then used this jack about ten months, without any trouble or any knowledge that it was defective, but after this suit was begun he was directed to lay it aside, obviously that it might be produced at the trial.

The proof then is that this jack has slipped three times in some eighteen years; that any such jack is liable to slip; that it will only slip when the dog fails to drop into the socket or ratchet; that such failure is in plain sight before those who are working the jack, and can be easily and instantly remedied by a push or a kick; that plaintiff had had such long experience in the use of such jacks that he would be presumed to know these details; that he showed he did know them when he made it the special duty of Elmer to watch the ratchet when jacking up a car; that the fact that Elmer kicked the ratchet when they finished jacking up the car indicates that those men all knew it might be necessary to force the dog into place. The proof does not explain why the kick did not force the dog into place, or why Elmer and Shaw and plaintiff did not see that the kick had not accomplished its purpose. It may be it did drop into place, and that when Elmer put the lever back as his father came out from under the car Elmer lifted some upon it and brought the dog out of the socket, and forgot it in the subsequent excitement when his father was struck by the lever. The proof on both sides shows this jack was not dangerous when properly handled, or when handled as other Joyce jacks require to be handled. It is worthy of notice that plaintiff did not testify he notified any officer of defendant that the jack was dangerous, but only that it was worn. Plaintiff was a skilled mechanic, and occupied a position where he controlled the men and their use of this tool. He was perfectly acquainted with the tool. He was long accustomed to the use of that kind of tools. Its worn condition was in plain sight as the tool was in use.

Plaintiff testified to a direction from the traveling car inspector to continue its use, coupled with a promise to replace it. While such direction and promise by the master will in many cases excuse the person injured by its use from assuming the risk incident to his employment, yet that rule is 'designed for the benefit of those engaged in work where machinery is used of which the employee has but little knowledge. It does not apply to the use of simple implements with which the employee is entirely familiar. Webster Mfg. Co. v. Nisbett, 205 Ill. 273. While this jack might seem a complicated machine to a section hand, it was a very simple tool to this experienced foreman. He was perfectly familiar with its slight defects, and in our judgment he assumed the risk arising from its use, as one of the ordinary hazards incident to his employment. We are therefore of opinion that the proof did not fairly tend to make a case for plaintiff, and that the court properly directed a verdict for defendant.

The judgment is affirmed.