MEDLIN MILLING CO. v. MIMS.
(No. 8051.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 5, 1914. Rehearing Denied Jan. 5, 1915.)

1. MASTER AND SERVANT &#9758;177—MASTER'S LIABILITY—FELLOW SERVANTS.

A servant injured as the immediate result of the negligence of a fellow servant cannot recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 307, 352, 353; Dec. Dig. &#9758;177.]

2. MASTER AND SERVANT &#9758;217—MASTER'S LIABILITY—ASSUMPTION OF RISK.

A servant, undertaking work with full knowledge of the usual way in which it has been done, assumes the risks of injury, unless relieved by the master's promise to change the method of work so as to eliminate the risks.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. &#9758;217.]

3. MASTER AND SERVANT &#9758;221—MASTER'S LIABILITY — ASSUMED RISK — PROMISE TO REMEDY DEFECT.

The rule that relieves a servant of an assumed risk, where the master promises to remedy the defect complained of, does not apply to cases of ordinary labor, not involving the use of dangerous and intricate machinery or any complicated method of performance, and the master need not promulgate formal rules therefor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 638–640, 642–645; Dec. Dig. &#9758;221.]

4. MASTER AND SERVANT &#9758;189 — FELLOW SERVANTS—"VICE PRINCIPAL."

One who had no power to either employ or discharge plaintiff, but who was a kind of general foreman, whom plaintiff generally obeyed, was not a "vice principal."

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 427–435, 437–448; Dec. Dig. &#9758;189.

For other definitions, see Words and Phrases, First and Second Series, Vice Principal.]

5. MASTER AND SERVANT &#9758;279—ACTION FOR INJURIES—EVIDENCE—PROMISE TO REMEDY DEFECT.

In a servant's action for injury, evidence *held* to show that the one whom he generally obeyed, and who, on his complaint of a defect and danger in the method of work, promised to try to have it fixed, was not a vice principal, on whose promise the servant might rely, so as to preclude assumption of the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 973–975, 978–980; Dec. Dig. &#9758;279.]

---

6. MASTER AND SERVANT ☞221—ACTION FOR INJURIES—ASSUMED RISK—PROMISE TO REMEDY DEFECT—CHANGE IN METHOD OF WORK.

The promise to repair or remedy a danger, which will relieve a servant from the consequences of continuing in his employment with knowledge of the danger, necessarily implies that the work is to continue substantially as before, with the added safety furnished by the remedy, and does not apply where the promised change would be an abandonment of the defective appliance, so that where a servant complained of the danger of throwing bags of mill waste from a window into a wagon below, and suggested a chute, and the master promised to install an apparatus which would do away with the hauling by wagon, and the servant continued work, he assumed the risk incident to that method of work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 638–640, 642–645; Dec. Dig. ☞221.]

7. MASTER AND SERVANT ☞276, 278—ACTION FOR INJURY — SUFFICIENCY OF EVIDENCE — DANGER IN METHOD OF WORK.

In a servant's action for injury from the negligence of a fellow servant in throwing a bag of mill waste out of a window into a wagon below, in which plaintiff was stowing it, evidence *held* not to justify the conclusion that the master was negligent in respect to the method or plan of work, or that the plan was a contributing cause of injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 956–972, 976, 977; Dec. Dig. ☞276, 278.]

8. MASTER AND SERVANT ☞130—MASTER'S LIABILITY—METHOD OF WORK.

A master is not bound to adopt the best possible method of doing his work, but, in cases where a formal rule or plan is necessary at all, is only required to exercise due care to adopt and promulgate a reasonably safe rule for doing it.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 264, 266, 276; Dec. Dig. ☞130.]

9. MASTER AND SERVANT ☞264—ACTION FOR INJURY—ISSUES AND VARIANCE.

In a servant's action for injury, where a promise of an alleged vice principal was not declared upon as a promise to remove risk of danger from the negligence of fellow servants, it could not, after judgment, be given such effect.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. ☞264.]

Buck, J., dissenting.

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Action by W. A. Mims against the Medlin Milling Company. Judgment for plaintiff, and defendant appeals. Reversed, and judgment rendered for defendant.

Capps, Cantey, Hanger & Short and W. L. Evans, all of Ft. Worth, for appellant. W. P. McLean and R. L. Carlock, both of Ft. Worth, for appellee.

CONNER, C. J. Appellee instituted this suit to recover damages for personal injuries received while in appellant's employ in hauling waste material gathered from the upper floor of appellant's mill. He alleged that the method of doing the work was to gather and sack the material, and to then throw the sacks out of a window of the second story of the mill into a wagon placed against the building below to receive the sacks; that on the occasion in question, while in the wagon in a stooped position, and while engaged in adjusting some sacks which had been already cast down, one Walter Sheffield, another employé of appellant engaged in the second story, threw a sack of such waste material down and upon appellee without warning, and thus seriously injured him. The ground of negligence charged was that the method of doing the work was dangerous, and that appellant was guilty of negligence in not adopting a method reasonably safe; it being particularly alleged in this connection that:

"A reasonably inexpensive, safe, and proper method of doing the said work was to have a chute, attached to the said window and extending to the wagon, whereby the sacks would be permitted to slide down from the upper story into the wagon without risk of danger to the man working in the wagon below. That either this method or some other equally safe method should have been adopted by the defendant in the exercise of due care."

Appellee further alleged that, prior to the accident in question, appellant's vice principal, D. R. Montgomery, had promised to adopt the chute, or some other safe method of doing the work, by reason of which appellee was induced to remain in appellant's service.

Appellant denied the allegations of appellee's petition, and pleaded that his injuries arose out of one of the risks of his employment, and that the sole proximate cause of the injury was the negligence of one of appellee's fellow servants, Walter Sheffield.

The court submitted the issues thus outlined to the jury, which returned a verdict in appellee's favor for $2,500, and judgment was rendered accordingly.

The questions raised on this appeal arise out of the evidence, which, so far as material to the questions discussed, is as follows: Appellee testified:

That he had been working for the appellant company a little over two years, driving a one-horse wagon for them, and delivering material and hauling things as required; that at the mill they had what was called a "head house," in which was collected the sweepings, consisting of dirty chops, dirty meal and bran, and such as that, and that "they would sack that up and throw it out of the window into a wagon below, and that it was hauled over to what they called the 'feed mill,' and there ground up into what they called stock feed. At the time I got hurt I had my wagon backed up under the window, * * * and I guess they had thrown down about seven or eight sacks into my wagon. The driver would always wait until they had thrown down a certain number of sacks, and then, in order to make room for more sacks, the driver would stack the sacks they had thrown down in the front end of his wagon. On the occasion of this accident, after they had thrown down seven or eight sacks, I got up there putting them in the front end of my wagon and was in a stooped position, just in the act of picking up a sack, when a sack they

threw out of the window hit me in the small of the back, inflicting the injuries of which I complain. * * * They were supposed to give notice every time they threw down a sack, and they almost always did it. I had placed two or three sacks in the wagon, and was in the act of picking up another one, when they threw this sack down on me without any warning or signal whatever having been given. * * * I was not expecting a sack to fall at the time it fell. * * * I gave the man a bawling out for his carelessness in letting the sack fall on me without giving me any notice. * * * This man Sheffield came down and apologized to me for it in the presence of 10 or 12 men. * * * Sheffield worked up in the mill there. * * * I had spoken to Mr. Montgomery about this being an unsafe and dangerous way to get these sweepings down. The first time that I remember talking to him about it he and I were standing on the fifth floor of the mill. * * * And we discussed the matter that evening. I told him that I thought it was a dangerous proposition to throw that stuff out of the window; that they might have a careless man there some day; and that he might kill somebody, and he said that Mr. Gladney had been talking about making a chute or cyclone to blow it over into the feed mill—all such stuff as that—and I told him that could be fixed very inexpensively by just putting a chute under the window and fastening it to the wall, and then backing the wagon up under the chute, but Mr. Montgomery wanted to fix it the other way. He said that they had it under advisement then as to how to fix it, and that they were figuring on having a cyclone to blow it over into the feed house, so that it would not have to be hauled at all. Mr. Montgomery told me that they were going to do it right away. Mr. Montgomery told me that he had taken up the matter with Mr. Gladney before that, and that he had promised to fix it, and that he would push the matter and see if he couldn't get it fixed as soon as possible, and I told him if he did not he was liable to get somebody killed there some time, and Mr. Montgomery said that he realized that it was dangerous. The second time he talked to him about it, he was still of the same intention, about putting in a cyclone over there, and he said that he was going to see that it was fixed, or keep after them until they did fix it. They had a cyclone there to blow the shucks away from the feed mill, and they were going to construct one like that. The one they had for the shucks was an iron pipe about ten inches in diameter, with a wheel to create the wind to blow the shucks away from the feed mill. * * * The last conversation I had with Mr. Montgomery about the matter he told me that he was going to keep after them until they put it in—until they fixed a safe way to let the stuff down. * * * Mr. Montgomery said if they did not put that in that they ought to put in something of that kind, and that he was going to keep after them until they did it. I understood that he was to put in a chute or a cyclone, one or the other. I believe Mr. Montgomery to be a man of his word, and, when he told me that he was going to do that, I believed that he would do it. The last conversation I had with Mr. Montgomery about this matter, I do not suppose that it was more than two weeks at the outside before I got hurt, maybe not more than a week. I was pretty sure he would have it attended to when he told me that he would. I would not have continued to work there if I had not thought that they would have it fixed as he stated, or unless they had put a watchman there—a good, careful watchman. * * * I have forgotten just exactly how long I worked for the mill the last time I worked for them, but it was about a year or a year and a half. * * * I think I was on the little wagon a little more than a year, and during all that time I never saw any of these sacks of

sweepings taken out any other way except through this window."

On cross-examination, and in reference to the matter of his complaint, he testified that he had spoken to Mr. Gladney about it, saying:

"I cannot say exactly when it was that I talked with Mr. Gladney about it, but it was in the neighborhood of the time that I first talked with Mr. Montgomery about it. * * * I did not talk to him two minutes. I went to tell him it could be fixed inexpensively by putting a chute in, and he said they were figuring on having it fixed another way—figuring on having a cyclone to blow it over there. * * * Mr. Montgomery never did tell me which way they were going to fix it, but he said he would have it fixed. He did not say whether he would put up a chute or put in the cyclone there, but he said he would have it fixed; that was what he told me. I cannot give you his exact words, but he said that he would take up the matter with them [Gladney and Rogers] again and would have it fixed. He said that he had already taken it up with them, and that they were going to build a cyclone to blow the stuff into the feed mill, so that there would be no more hauling. That is what Mr. Montgomery told me—that they were going to build a cyclone to blow it over there. * * * He and I were talking over the matter of putting a chute up there, and he told me that he was going to take the matter up with them and see that it was done. He did not say whether it was to be a chute or cyclone. We were discussing both, and he said they had been discussing the matter, and he would take it up with them and try to get them to do it. * * * The second conversation occurred some eight or ten days, possibly, before I got hurt. I told him [Montgomery] about the same thing that I had told him when we were up on the fifth floor there, and he told me that he had already taken up the matter with Mr. Gladney and the department there, and he said they kicked so much about improvements that he was almost afraid to suggest anything to them, but he said that they had already taken it up with them, and that they had promised to have it fixed—had promised him to have it fixed—Mr. Rogers and Mr. Gladney had promised him and Mr. Montgomery promised me. Mr. Montgomery told me that they said they would have it fixed in the way of a cyclone. That is the way they wanted to fix it. * * * The custom was, when they went up there to throw the sacks out of the window, for them to holler or give some signal to the man below. They would usually let a man sit in one of the windows, and he would call out to the man below, and the man below would take his position in front of his wagon and get out of the way. I understood that to be the custom there in throwing the sacks out of the window. * * * While I was moving the sacks to the front end of the wagon, I could not look up to see if any sacks were coming down. I was looking in the other direction and did not see what was going on up there. I thought they had some one looking out for me as they usually did. At the time I had my conversation with Mr. Montgomery about this chute, he was in charge of the milling department—what is called a superintendent—and he employed and discharged men there. The miller is almost considered the highest man in the mill outside of the office. * * * Mr. Gladney employed me. You see the men in the warehouse [the department in which appellee worked] are under the supervision of the office. I don't know how they consider it, but Mr. Montgomery never did hire me. * * * With the feed mill they had four departments there. The grain man employed his helpers to load and unload the grain; the miller employed his helpers in grinding the grain and sacking the

bran and everything of that kind; and the shipping clerk had charge of the warehouse and the drivers. I got my job from Mr. Gladney and Mr. Rogers, each time, but whatever Mr. Montgomery suggested, I would do it. I always looked to Mr. Montgomery as the man in authority out of the office. I don't know whether you would say that Mr. Montgomery had control over my actions or not. He did not have charge of the teams, but they were under the control of the shipping clerk, and at that time Mr. Colly was the shipping clerk. I did not consider that I was working under Mr. Colly. Mr. Montgomery was over all the other departments, and I always looked to Mr. Montgomery as being the head man. When I was shipping clerk, I always looked to Mr. Montgomery. Mr. Rogers was the head man of the mill, but he was not there regularly. I did not understand that Mr. Montgomery just had charge of his own department. I was on the wagon, but still as I understood it, Mr. Montgomery had charge of all the departments. * * * I knew that was a place of danger if they did not properly watch and care for it, but usually there were about four men up there, and they kept one of them on the watch to protect the man below, and I did not think I was in any danger, from the fact that I thought there was a watchman there, as there usually was, to notify the driver below when the next batch of stuff would be thrown down. If I had thought I was in any danger, I would not have been there."

[1, 2] It is undisputed that Sheffield was a fellow servant of appellee, and that his negligence was the immediate cause of appellee's injury; and it is further undisputed that appellee had full knowledge of the usual way in which the work had been done; and hence it must be conceded that appellee should be denied a recovery on the ground that his injury arose from one of the risks assumed by him, unless he is relieved from this general rule because of the promise of Montgomery, as alleged and as testified to by him. See G., C. & S. F. Ry. Co. v. Garren, 96 Tex. 605, 74 S. W. 897, 97 Am. St. Rep. 939; G., H. & S. A. Ry. Co. v. Eckols, 7 Tex. Civ. App. 429, 26 S. W. 1117; G., C. & S. F. Ry. Co. v. Brentford, 79 Tex. 619, 15 S. W. 561, 23 Am. St. Rep. 377; Sweeney v. Berlin & Jones Envelope Co., 101 N. Y. 520, 5 N. E. 358, 54 Am. Rep. 722; Anderson v. Seropian, 147 Cal. 201, 81 Pac. 521; Purcell Mill & Elevator Co. v. Kirkland, 2 Ind. T. 169, 47 S. W. 311.

[3] Generally speaking, the rule that relieves an employé of an assumed risk, where the master promises to remedy the defect complained of, does not apply to cases of ordinary labor, not involving the use of dangerous and intricate machinery, and not involving some complicated method of performance. Must a herdsman promulgate orders that his riders shall get out of the way of a stampeding herd? Or a contractor that his servants digging a ditch shall work far enough apart to avoid striking one another with their picks? Perhaps the case before us is not so simple as the illustrations given, but it is not to be denied that the master, in the absence of knowledge to the contrary, has the right to assume that his employés are sentient beings—not mere automatons—who will exercise ordinary care for their own and

their fellows' safety, and the law does not devolve the duty upon the master of promulgating formal rules for ordinary labor involving no complexity. Boyer v. Eastern Ry. Co. of Minnesota, 87 Minn. 367, 92 N. W. 326; Crum v. Vernon P. & L. Co., 34 Ind. App. 253, 72 N. E. 193; Meador v. Railway Co., 138 Ind. 290, 37 N. E. 721, 46 Am. St. Rep. 384; Ky. & Ind. B. & R. Co. v. Melvin (Ky.) 104 S. W. 335; Stirling C. & C. Co. v. Fork, 141 Ky. 40, 131 S. W. 1030, 40 L. R. A. (N. S.) 837; Kistner v. Am. Steel Foundry, 233 Ill. 35, 84 N. E. 44; Webster Mfg. Co. v. Nisbitt, 205 Ill. 273, 68 N. E. 936; G., C. & S. F. R. R. Co. v. Larkin, 98 Tex. 225, 82 S. W. 1026, 1 L. R. A. (N. S.) 944; Levinson v. Lyon, 151 Ill. App. 284; Bowen v. C. & N. W. R. R. Co., 117 Ill. App. 9; Int. Packing Co. v. Kretowicz, 119 Ill. App. 488; Dauchy Iron Works v. Nevin, 130 Ill. App. 475; Rahm v. C., R. I. & P. R. R. Co., 129 Mo. App. 679, 108 S. W. 570; Baumwald v. Trenkman, 88 N. Y. Supp. 182; McGill v. Cleveland & S. W. Traction Co., 79 Ohio St. 203, 86 N. E. 989, 19 L. R. A. (N. S.) 793, 128 Am. St. Rep. 705; Corcoran v. Milwaukee G. Co., 81 Wis. 191, 51 N. W. 328; St. L., A. & T. R. R. Co. v. Kelton, 55 Ark. 483, 18 S. W. 933; Brewer v. Tennessee Coal, Iron & R. R. Co., 97 Tenn. 615, 37 S. W. 549; 3 La Batt on Master and Servant, § 1115.

But regardless of this suggestion, and assuming that appellant had in fact adopted the method in use, as is perhaps to be inferred from the proof of the "usual custom," let us consider the precise character of the promise relied upon in appellee's behalf.

[4] In the first place, it seems reasonably clear that the promise of Montgomery was not that of a vice principal, nor such as authorized unquestioned reliance thereon. Appellee testified:

That he was employed by Gladney and Rogers, and that "I do not know whether you would say that Mr. Montgomery had control over my actions or not. He did not have charge of the teams, but they were under the control of the shipping clerk."

No testimony was offered that Montgomery had power to either employ or discharge appellee, as was incumbent upon him to show, and the mere fact that Montgomery was a kind of general foreman, and that appellee generally obeyed his instructions, did not constitute him a vice principal. Lantry-Sharpe Construction Co. v. McCracken (Sup.) 150 S. W. 1157.

[5] On the contrary, the evidence as a whole, when carefully considered, shows that Gladney and Rogers employed appellee, and that these persons were the "higher-ups," in whom authority to remedy the defect complained of was vested, and that Montgomery's promise in its essence was to use his best efforts to "fix it." To reiterate: Appellee testified:

"The first time I mentioned this matter to Mr. Montgomery he said they were going to fix

it. * * * He said that they had discussed the matter, and that he would take it up with them and try to get them to do it."

The pronouns "they" and "them," as here and elsewhere used in appellee's testimony, undoubtedly referred to Mr. Gladney and Mr. Rogers, one or both; the testimony thus indicating that the determination of whether the danger in mind was to be relieved rested with Mr. Gladney and Mr. Rogers, the heads of the department, and not · with Montgomery. If so, Montgomery's promise would in no event relieve appellee from the assumed risk, as in such case he evidently had no right to absolute reliance thereon.

[6] But if, in aid of the verdict, we should give the contrary effect to several of appellee's general statements that "Montgomery promised me to have it fixed," it does not yet appear that the promise made brings the case within the principle invoked in appellee's behalf. It was (quoting appellee's specific words):

"That they would have it fixed in the way of a cyclone," and not by constructing a "chute." "Mr. Montgomery told me that they were going to blow it [the refuse material] over there through a cyclone. * * * That they were going to build a cyclone and blow it over there. * * * "

As shown by the evidence, a "cyclone" was a contrivance, by means of which the refuse could be blown through a pipe from the place where gathered direct to the room or place where it was · utilized in making stock feed. This plan contemplated an entire abandonment of the method of removing or transferring the refuse in the old way by wagon, "so that [to use Mr. Montgomery's language as related by appellee] there would be no more hauling." Appellee could not reasonably have understood anything else. The promise to repair or remedy a danger which will relieve a servant from the consequences of continuing in his employment with full knowledge of the danger necessarily embodies the conclusion that the work is to continue substantially as before, with the added safety provided by the repair. The principle can have no proper application to a case where, as here, the change to be made will work a complete abandonment of the defective tool, machinery, or plan, as the case may be, from which the hazard or danger arises. Considering the testimony as a whole, appellee must have understood that, if a "cyclone" was installed, he would be "out of a job," so far as it was represented by a removal of the refuse by wagon, and that until such time the method then in use would be followed. Under such circumstances, appellee must be held to abide by the consequences of continuing his work with full knowledge of the danger of which he complained.

[7, 8] Moreover, we fail to see in what way negligence can be affirmed of the plan or method assailed, or at least in what way the "method" co-operated with the undisputed negligence of Sheffield, so as to become an efficient cause of appellee's injury. Again recapitulating: Appellee thus described the method of doing the work in vogue at the time:

"They were supposed to give notice every time they threw down a sack, and they almost always did it. I would not have continued to work there if I had not thought they would have fixed it as he stated, or unless .they had put a watchman there—a good, careful watchman. * * * The custom was, when they went up there to throw the sacks out of the window, for them to holler or give some signal to the man below. They would usually let a man sit in one of the windows, and he would call out to the man below, and the man below would take a position in front of his wagon and get out of the way. I understood that to be the custom, and they would throw the sacks out of the window. * * * I thought they had some one looking out for me as they usually did. * * * If I had thought I was in any danger I would not have been there."

This testimony, coupled with appellee's statement of what he said to Montgomery about the danger involved, shows that the trouble was not in the plan—the method—usually followed. The danger feared was "carelessness" or negligence on the part of some employé who at some time ·might be engaged in throwing sacks out from above. Appellee says:

"I told him [Montgomery] that I thought it a dangerous proposition to throw that stuff out of the window, and that they might have a careless man there some day."

Not a word was then said in objection to the method. It seems evident that, so long as the "usual method" of having a watchman who gave the required warning was followed, no danger was to be anticipated to an employé in the wagon in the exercise of ordinary care for his own safety. The master is not bound by the law to adopt the best possible plan of doing his work. It is only required, in cases where a formal rule or plan is necessary at all, that the master exercise due care to adopt and promulgate a reasonably safe rule for doing the work involved. Welch v. Dieter, 136 Mo. App. 260, 117 S. W. 97; Railway v. Warner, 36 S. W. 118; Titus v. Railway, 136 Pa. 618, 20 Atl. 517, 20 Am. St. Rep. 944. And in doing this he is · not bound to anticipate negligence on the part of an employé. See 26 Cyc. 1113, 1114, and Hussey v. Coger, 112 N. Y. 614, 20 N. E. 556, 3 L. R. A. 561, 562, 8 Am. St. Rep. 787. In the case last cited, in some respects very similar to the one before us, the court, among other things, said:

"The proof in this case does not show that the master omitted the performance of any such duty. He had provided a skilled and competent man to superintend and direct the work; a sufficient force, with all necessary and proper means and, appliances, to perform it; and a safe place, free from any inherent dangers, in which to carry it on. He was not chargeable with the consequences of a place for work made dangerous only by the carelessness and neglect of fellow servants, or for the negligent manner in

which they used the tools or materials furnished to them for their work."

So that, as already suggested, we fail to see any such inherent defect or danger in the method of work complained of in this case, when considered apart from the carelessness or negligence of fellow servants, as justifies the conclusion that appellant was either guilty of negligence in respect to the method or plan of the work, or that the plan was a contributing cause of appellee's injuries. Brewer v. Tenn. Coal, Iron & Ry. Co., 97 Tenn. 615, 37 S. W. 549, and cases hereinbefore cited.

Considerable stress has been laid on Montgomery's recognition of the danger and of his promise to fix it. The recognition is found in appellee's first conversation with Montgomery, wherein he told Montgomery that "they might have a careless man there some day," etc., and to which Montgomery replied that "he realized that it was dangerous," etc. It is apparent, we think, that the danger in mind on the part of both appellee and of Montgomery was not inherent in the method, but was that which arose out of the possibility of negligence that might arise some time on the part of some employé engaged in the second story. No complaint was made that any specific employé was in fact of negligent character, or that appellant was guilty of negligence in employing or retaining an employé of a negligent or careless character. All of this falls short of showing that Montgomery or plaintiff thought there was danger in the method apart from possible negligence of an employé, and which, as we have seen, the master was not bound to anticipate.

[9] It is doubtless true that the master may contract against negligence, but Montgomery's promise was not declared upon as such, and as such cannot now be given any effect.

We conclude on the whole that the evidence entirely fails to support the verdict and judgment in appellee's favor; and it is accordingly ordered that the judgment be reversed and here rendered for appellant.

BUCK, J. (dissenting). I cannot agree with my Brethren in the disposition of this case, nor in some of the conclusions reached in the majority opinion. In the first place, I cannot concur in the statement contained in said majority opinion to the effect that "not a word was said in objection to the method" (of doing the work). It is true that, so long as those employed in the throwing of the sacks out of the window to the wagon below were careful to give the requisite warning to the appellee below in time for him to remove himself from a place of danger before the sack fell, it was not a dangerous method of performing the business of the master. But that there was a strong probability that the one or ones accustomed to give such warning would, through some momentary forgetfulness, fail to do so, and thereby endanger the life or subject the person of the driver below to injury, and that such danger arose from the inherent manner of performing the work, was apparent to and recognized by both appellee and the vice principal of appellant, Mr. Montgomery, is shown by the fact that on more than one occasion appellee complained to said Montgomery of the dangerous method of performing the work, calling the attention of said Montgomery to the extreme probability of the occurrence of just what did occur, and "that he was likely to get somebody killed there some time, and Mr. Montgomery said that he realized that it was dangerous." (S. F. 7.)

Since the vice principal realized the dangerous method of performing this service, and that an entirely safe method could be employed at a very moderate cost, the familiar rule of law that the master is not bound to presume that a fellow servant of an employé will be negligent is not applicable. In this case he did recognize the strong probability of a fellow servant failing to give the required warning, and that serious injury would result to appellee or others engaged in receiving the sacks from the window above. That appellee did not assume the risk incident to this method of performing the work is shown beyond question. Mr. Montgomery had promised to remedy the defect, and had stated that Mr. Gladney, one of the "higher-ups," referred to in the majority opinion, had also promised to have a safer method invoked and employed. Appellee had a right to rely on this promise for a reasonable length of time. He testified that he would not have continued in this part of his employment but for the reliance on such promise.

In spite of some language in the majority opinion seeming to question Mr. Montgomery's authority to bind the defendant by such promise, and seeming to negative the idea of his being a vice principal, it is believed that, so far as the record discloses, he undoubtedly was vested with such authority. The plaintiff alleged in his petition that said Montgomery was defendant's vice principal, and this allegation is nowhere denied in the pleadings of defendant nor contradicted by any evidence offered by it. The case was tried and submitted upon that theory, and no assignment of error is predicated upon any error of the trial court in this respect. Therefore it is justifiable to assume that defendant admitted the truth of such allegation.

All these questions involving the negligence vel non of the defendant in failing to use ordinary care to provide plaintiff a safe place to work, the giving or not of the promise by Montgomery to remedy the defect complained of, the contributory negligence or not of the plaintiff in continuing in such

employment after the giving of such promise, etc., were fully covered in the charge of the court, and not an assignment of error is offered complaining of the giving of any charge or the failure to give any charge, save the peremptory instruction submitted on behalf of defendant.

That appellee's fellow servant, Sheffield, was negligent, cannot be gainsaid, but the jury found, as shown by their verdict, that the defendant was also guilty of negligence in failing to furnish plaintiff a reasonably safe place in which to work, and that such negligence was the proximate cause of the injury complained of. It is then the well-recognized rule of law that, if the negligence of a fellow servant and the negligence of the master are both the concurring proximate causes of an injury to a servant, the master is liable.

It is regretted that lack of time prevents a fuller discussion and investigation of these matters upon which this dissenting opinion is predicated, but the writer is forced to content himself with these observations. It is believed that the action of the trial court in refusing to give the peremptory instruction asked should be sustained, and the judgment affirmed.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

